**Roy BUCHSBAUM, M.D., Appellant,**

v.

**UNIVERSITY PHYSICIANS PLAN; University of Pittsburgh Medical Center Health System; University of Pittsburgh; Latrobe Area Hospital.**

No. 02–1526.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Nov. 19, 2002.

Decided Dec. 10, 2002.

Before BARRY, AMBRO, Circuit Judges, and ACKERMAN,* District Judge.

OPINION

BARRY, Circuit Judge.

Dr. Roy Buchsbaum, a hearing-impaired radiation oncologist, sued his former employer, the University Physicians Plan ("UPP"), the Latrobe Area Hospital ("La-

* The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

* The Honorable Harold A. Ackerman, United States District Judge for the District of New Jersey, sitting by designation.

trobe"), and other related defendants alleging unlawful discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"), and the Pennsylvania Human Relations Act, 43 Penn. Stat. Ann. § 951 *et seq.* ("PHRA"), in addition to various common law claims. Buchsbaum alleged that UPP and Latrobe discriminated against him on the basis of his disability and age when they transferred him from his position as Director of Radiation Oncology at Latrobe to a less lucrative position at Presbyterian University Hospital in January of 1998. In an Opinion and Order filed December 19, 2001, the District Court granted defendants' motion for summary judgment as to the claims under the ADA, ADEA, and PHRA,[1] and dismissed the common law claims for lack of subject matter jurisdiction. We have jurisdiction over Buchsbaum's appeal pursuant to 28 U.S.C. § 1291 and will affirm.

## I.

Because the parties are familiar with the record, we recapitulate only those facts necessary for our analysis. Buchsbaum, born July 28, 1946, suffers from a moderately severe neurosensory hearing loss. With both hearing aids in place, he can understand most spoken communication if the speaker speaks clearly to his face in a quiet environment but begins to lose content if the speaker mumbles, speaks softly or rapidly, or is not facing him, or if there is background noise. In 1987, University Radiation Associates ("URA"), the predecessor of UPP, hired Buchsbaum for a position on the clinical faculty of the University of Pittsburgh. From 1993 to 1994, Buchsbaum was Acting Medical Director of the Department of Radiation Oncology at Magee Women's Hospital ("Magee"). In late 1993 or early 1994, Dr. Joel Greenberger, President of URA, received complaints from some staff members at Magee that Buchsbaum was behaving rudely toward patients and staff. After discussing the complaints with Buchsbaum, Greenberger realized that the complaints resulted from Buchsbaum's hearing difficulty; he seemed to be rude when in fact he was not hearing what staff members were saying. The situation was resolved when Buchsbaum called a meeting of the Magee staff to apologize for his perceived rudeness and explained how people could make sure he was hearing them if they thought he was being rude or unresponsive.

Later in 1994, Greenberger transferred Buchsbaum from Magee to head up a new radiation oncology practice at Latrobe Area Hospital and, between 1994 and 1997, Buchsbaum built that practice. Despite Buchsbaum's apparent successes, in August of 1997, a few staff members complained to Dr. Thomas Gessner, the Medical Director of the hospital, about Buchsbaum's conduct with staff and patients. At an August 20, 1997 meeting with Gessner, two staff members from Buchsbaum's department and an administrator expressed concern about Buchsbaum's difficulties in remembering changes in patient treatment plans and the results of patients' laboratory tests. In follow-up written reports requested by Gessner, the two staff members further documented myriad complaints about Buchsbaum's professional conduct: inappropriate comments to patients concerning his compensation and his

---

1. The District Court dismissed Buchsbaum's PHRA claims along with his analogous federal claims under the ADA and the ADEA because the analysis is identical. *See Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 382 (3d Cir. 2002) (ADA); *Connors v. Chrysler Fin. Corp.,* 160 F.3d 971, 972 (3d Cir.1998) (ADEA). For the same reason, we do not separately address Buchsbaum's PHRA claims.

being "stuck" at Latrobe, repeated tardiness causing patients to wait unnecessarily, frequent unannounced sick days, misplaced files and reports, problems finding Buchsbaum when he should be available, an uneven and unpredictable temperament, and sarcastic responses to requests that Buchsbaum keep staff better informed about updates to patient information and treatment plans.

At an August 22, 1997 meeting called by Gessner to address these complaints, Buchsbaum denied any illness or substance abuse which could be causing his problems, and agreed to undergo a psychological evaluation to confirm that he was not experiencing memory or cognitive impairments. After an initial examination on October 14, 1997, the psychologist to whom Gessner had referred Buchsbaum, Dr. Larry Sellitto, referred Buchsbaum to Dr. William Hawthorne for further testing. Hawthorne concluded that Buchsbaum had no memory impairments. In his report to Sellitto, Hawthorne concluded that "what others perceive as [Buchsbaum's] *forgetting* things is very likely the result of his never having heard them in the first place. In this regard his impairment most likely arises out of perceptual rather than cognitive factors and probably comes under the general provisions of the ADA . . . requiring some on the job accommodation." (emphasis in original). Dr. Sellitto's written opinion of January 7, 1998, delivered to Gessner, repeated verbatim this paragraph of Hawthorne's opinion.

Before Gessner received the final results of Buchsbaum's psychological evaluations, however, Greenberger began his own investigation into the complaints about Buchsbaum. On November 28, 1997, Greenberger went to Latrobe to meet with the two staff members who had complained to Gessner. The staff members reiterated the concerns they had raised

concerning the fact that Buchsbaum was late for patient appointments, that he failed to tell staff about changes to patient records and treatment plans, and that he repeatedly made sarcastic remarks to department staff. Later that same day, Greenberger met with Dr. Wiley Overly and Dr. Matthew Sulecki, oncologists who worked with Buchsbaum. Overly complained that Buchsbaum was arriving to work late, missing early-morning patient appointments, and that Buchsbaum's communications were delayed because he still had not learned to use the hospital dictation system. He also complained about Buchsbaum's lack of interest at tumor board meetings, to which he often either arrived late or left early.

At the conclusion of his visit to Latrobe, Greenberger met with Gessner to discuss the staff complaints about Buchsbaum. Although Gessner and Greenberger had not received the final results of the psychological evaluation, they nonetheless decided that the staff complaints about Buchsbaum warranted removing him from Latrobe. Greenberger informed Buchsbaum of this decision at a meeting on January 9, 1998, and confirmed the decision in a letter dated January 16, 1998, which explained the reasons for his transfer as follows:

Over the past two months, there has been heightened concern voiced to me in several face-to-face meetings and telephone conversations with administrative staff in the Department of Radiation Oncology at Latrobe Area Hospital, Chief of Staff's office, and referring physicians that they are not satisfied with the level of service of our practice group at the present time. They have listed as reasons for their concern a perceived lack of enthusiasm by you for clinical oncology programs at Latrobe Area Hospital, a sub-optimal level of both ver-

bal and written communication by you concerning patient care activities, and perceived lack of your availability for clinical consultation in patient care matters at times when they perceive such availability is required.

Our decision to request that you switch your practice sites is based on the clear message that if we did not comply with their requests University Radiotherapy Associates, Inc., might lose its service contract at Latrobe Area Hospital.

On January 10, 1998, Buchsbaum wrote to Douglas Clark, CEO of Latrobe, explaining that Greenberger had just informed him that he was being transferred. Buchsbaum stated that he had not been informed that his tardiness was a problem and speculated that the communications problems mentioned by Greenberger were probably a result of his hearing impairment. Approximately two weeks later, in late January of 1998, Buchsbaum met with Gessner. At the meeting, Gessner explained that although Buchsbaum's clinical work was largely satisfactory, he had to be removed because certain staff members were not happy working with him. Gessner also told Buchsbaum that the radiation oncology department at Latrobe was one of the most poorly administered departments he had seen and that Latrobe was not willing to give him a second chance. On July 16, 1998, Buchsbaum resigned from his position with UPP, effective August 31, 1998, and joined a group radiation oncology practice in Memphis, Tennessee.

## II.

Buchsbaum argues that the District Court erred in granting the defendants'

motion for summary judgment for two reasons: first, the Court failed to apply a "mixed motive" analysis to the "direct evidence" of discrimination present in the record, rather than the more employer-friendly burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); and second, the Court erred in finding that the record contained insufficient evidence to allow a reasonable jury to find that the defendants' proffered reasons for transferring Buchsbaum were a pretext and the real motive for the transfer was discrimination on the basis of Buchsbaum's disability and age.[2]

We review *de novo* the District Court's grant of summary judgment. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 727 (3d Cir.1997). Thus, summary judgment will have been warranted only if the record contains insufficient evidence to allow a reasonable jury to find in favor of the non-moving party at trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The reviewing court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in his or her favor. *Id.* Applying these standards, we find Buchsbaum's claims to be without merit.

### A.

■ While a motion for summary judgment on an employment discrimination claim under the ADA or the ADEA is typically considered under the burden-shifting analysis established in *McDonnell Douglas*, the "mixed motive" analysis of

---

**2.** In his complaint, Buchsbaum also alleged that the defendants violated the ADA by failing to reasonably accommodate his hearing disability. *See* 42 U.S.C. § 12112(b)(5)(A). Because Buchsbaum did not address his failure to accommodate claim either in his opposition to summary judgment or in his brief on appeal, he has waived the claim, and we do not consider it.

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), may be applied instead if the plaintiff has produced "direct evidence" of the employer's discriminatory animus.[3] Under a *Price–Waterhouse* "mixed motive" analysis, where there is strong evidence of an employer's discriminatory animus, the burden of proof shifts from the plaintiff to the employer to prove that its motives for the employment action were "mixed"—that is, while some motives were discriminatory, the employer had legitimate non-discriminatory motives as well which would have resulted in the adverse employment action. Thus, we have described the "direct evidence" that the employee must produce at the summary judgment stage to warrant a "mixed motives" analysis as "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production.... [T]he risk of non-persuasion [is] shifted to the defendant who ... must persuade the factfinder that ... it would have made the same employment decision regardless of its discriminatory animus." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 778 (3d Cir.1994). Such direct evidence "requires 'conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude.'" *Starceski v. Westinghouse Electric Corp.*, 54 F.3d 1089, 1096 (3d Cir.1995) (quoting *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 470 (3d Cir.1993)).

The record is bereft of evidence, much less this sort of compelling evidence, that those in the decisionmaking process at UPP and Latrobe were motivated by discriminatory animus when they transferred Buchsbaum from Latrobe to Presbyterian in January of 1997. The lone fact that Selitto's psychological evaluation opined that Buchsbaum's perceived memory problem was likely a function of his hearing impairment does not in itself prove that Greenberger or Gessner decided to transfer him on the basis of his disability, especially given the fact that they made the decision at a meeting on November 28, 1997 before Selitto even delivered his report. Similarly, the refusal to transfer Buchsbaum back to Latrobe after it had been decided that his conduct was harming the radiation oncology practice also falls short as "direct evidence" that the transfer was discriminatory. As for the age claim, the only piece of evidence proffered by Buchsbaum as direct evidence of age discrimination was a bit of testimony from Greenberger's deposition about UPP wanting to hire young research oriented faculty generally. This snippet was not only taken out of context, but has no relevance to the decision to remove Buchsbaum from Latrobe. Accordingly, Buchsbaum's "mixed motives" argument is without merit and the *McDonnell Douglas* analysis applies.

### B.

█ Under the familiar three-step burden-shifting analysis of *McDonnell Douglas*, the Court determines, first, whether the plaintiff has established a *prima facie* case of unlawful employment discrimination. If the employee successfully establishes a *prima facie* case, the "the burden of production shifts to the employer to

---

**3.** Appellees argue that Buchsbaum waived his argument that a "mixed motives" analysis is appropriate by failing to expressly raise the argument in the District Court. We have said, however, that a district court should consider whether a plaintiff's claim should survive summary judgment under a *Price Waterhouse* analysis even if it is unclear whether the plaintiff raised the theory in response to a summary judgment motion. *See Hankins v. City of Philadelphia*, 189 F.3d 353, 364 n. 6 (3d Cir.1999).

'articulate some legitimate, nondiscriminatory reason' " for the adverse employment action. *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994) (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). Third, if the employer can articulate such a reason, the burden of production shifts back to the employee, who must produce "sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment actions." *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1067 (3d Cir. 1996) (en banc).

None of the parties before us disputes that Buchsbaum established a *prima facie* case of discrimination, or that the UPP defendants successfully articulated non-discriminatory reasons for removing Buchsbaum from Latrobe. Our analysis thus proceeds directly to the third *McDonnell Douglas* step, and our determination as to whether there was sufficient evidence in the record to allow a reasonable jury to find that the UPP defendants' proffered reasons were a pretext for discrimination. An employee can show pretext at the third step of *McDonnell Douglas* by *"either* (i) discrediting the [employer's] proffered reasons, either circumstantially or directly, or (ii) adducing evidence … that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes,* 32 F.3d at 764. As to the quantum of evidence required, the record must be sufficient to allow "a reasonable factfinder to infer that *each* of the employer's non-discriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." *Id.* (emphasis in original).

Viewing the record as a whole, there is insufficient evidence to enable a reasonable jury to find that the reasons given by Greenberger, Gessner, and Clark for Buchsbaum's transfer were false or were not the real motives for Buchsbaum's termination. Indeed, Buchsbaum does not dispute that many of the complaints made by the radiation oncology department staff about his behavior bear no logical connection to his hearing impairment or his age: the fact that he was repeatedly late for early-morning patient appointments, his failure to communicate treatment plan changes to staff, his disappearance when staff needed to find him, his sarcastic remarks and moodiness, and his inappropriate comments to patients. Even if certain of the complaints that the staff levied against Buchsbaum might, at least as an abstract matter, have resulted from misunderstandings caused by that impairment or his age (e.g., his apparent lack of interest at tumor board meetings and apparent lack of memory), there is simply no evidence of pretext.

Although perhaps Greenberger and Gessner could have conducted a more thorough investigation of the complaints concerning Buchsbaum, there is no evidence that their decision to transfer him was motivated by discriminatory animus based on his age or disability. As we have said: "To discredit the employer's proffered reason … the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether the discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes,* 32 F.3d 759, 765 (3d Cir.1994).

### III.

We will affirm the December 19, 2001 order of the District Court.