

Opinions of the United
States Court of Appeals
for the Third Circuit

8-1-1994

# Fuentes v. Perskie, NJ Casino Control Comm.

Precedential or Non-Precedential:

Docket 93-5561

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Fuentes v. Perskie, NJ Casino Control Comm." (1994). *1994 Decisions.* Paper 100.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/100

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

NO. 93-5561

_____


LUIS A. FUENTES,

Appellant

v.

STEVEN P. PERSKIE, CHAIRMAN OF THE NEW JERSEY
CASINO CONTROL COMMISSION; THE NEW JERSEY
CASINO CONTROL COMMISSION

_____


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 92-cv-00190)

_____


Argued:  June 23, 1994

Before:  BECKER and HUTCHINSON, Circuit Judges,
        and PADOVA, District Judge[0]

(Filed August 1, 1994)

                        LOUIS M. BARONE (Argued)
                        LYNN M. HANDLER
                        JACOBS, BRUSO & BARBONE, P.A.
                        1125 Pacific Avenue
                        Atlantic City, NJ  08401
                            Attorneys for Appellant

                        JOHN R. ZIMMERMAN (Argued)
                        CATHERINE A. WALKER
                        Casino Control Commission
                        Tennessee Avenue and the
Boardwalk
                        Arcade Building, 2nd Floor

_____

[0]The Honorable John R. Padova, United States District Judge for
  the Eastern District of Pennsylvania, sitting by designation.

Atlantic City, NJ  08401-0208
Attorneys for Appellee

---

**OPINION OF THE COURT**

---

BECKER, <u>Circuit Judge</u>.

Plaintiff Luis A. Fuentes appeals from the district court's grant of summary judgment for the defendants, the New Jersey Casino Control Commission (the "Commission") and Commission Chairman Steven Perskie, in this national origin employment discrimination suit brought by Fuentes in the district court for the District of New Jersey pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), as amended, 42 U.S.C.A. §§ 2000e to 2000e–17 (1981 & Supp. 1994). The question before us is the proper standard for granting summary judgment in a claim arising under Title VII in the wake of the Supreme Court's decision in <u>St. Mary's Honor Center v. Hicks</u>, 113 S. Ct. 2742 (1993). In particular, we consider the evidence that a plaintiff, who has made out a prima facie case, must adduce to survive a motion for summary judgment when the defendant offers a legitimate reason for its employment action in a "pretext" employment discrimination case. We hold that, to do so, the plaintiff generally must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely then not a motivating

4

or determinative cause of the adverse employment action. Because Fuentes failed to throw sufficient doubt on any of the Commission's proffered reasons, we will affirm the district court's grant of summary judgment.

## I.  FACTS AND PROCEDURAL HISTORY[0]

The Commission, an agency of the State of New Jersey, see N.J. STAT. ANN. § 5:12-1 et seq. (1988 & Supp. 1994), employed Fuentes on May 18, 1987 as Director of Affirmative Action and Planning.  At that time the Commission was comprised of five divisions.  Fuentes' position placed him in charge of the Division of Affirmative Action and Planning ("AA&P").  Fuentes reported directly to the Chairman of the Commission, Walter Read, from his initial hiring until Read's retirement in January 1990. Read was at all times satisfied with Fuentes' performance. Fuentes also developed a close working relationship with Commissioner David Waters, who had a special interest in affirmative action.  Waters was fond of Fuentes, and credited him with the turnaround of the Division.

---

[0]In reviewing the grant of a motion for summary judgment, we (i) resolve conflicting evidence in favor of the nonmovant, (ii) do not engage in credibility determinations, and (iii) draw all reasonable inferences in favor of the nonmovant.  The movant has the burden of pointing out that evidence cognizable in a motion for summary judgment which the movant believes entitles it to summary judgment; the nonmovant must then respond by pointing to sufficient cognizable evidence to create material issues of fact concerning every element as to which the nonmoving party will bear the burden of proof at trial. See Davis v. Portline Transportes Maritime Internacional, 16 F.3d 532, 536 & n.3 (3d Cir. 1994).

On August 20, 1990, newly elected Governor James Florio appointed defendant Perskie as Chairman of the Commission. In the ensuing two months, Perskie undertook an informal review of the entire Commission, including its structure. Faced with a declining budget and state-issued directives to reduce staffing, Perskie requested his Executive Assistant Joseph Papp to develop a reorganization plan (the "Plan"). The resulting Plan incorporated most of the recommendations made by a private consulting firm hired by the Commission to audit its utilization of resources. On November 7, 1990, Perskie announced an ambitious Plan to the Commission staff, and the Commission adopted it two weeks later.

The Plan called for the elimination of two divisions, including AA&P,[0] the creation of a new Compliance Division, and the considerable reorganization of two others. The Plan transferred the primary functions of AA&P to a subdivision, entitled the Affirmative Action/Equal Employment Opportunity Unit ("AA/EEO"), within the new Compliance Division. The reorganization reduced the Commission's staff from 542 to 446 employees.

The Commission resolved to post and advertise all new management positions. Fuentes, along with all other personnel whose positions would be eliminated under the Plan, was advised to apply for the new positions that interested him, and he, along with twenty-five other candidates, applied for the position of

---

[0]Fuentes does not contend that illegal discrimination caused the elimination of his old position as Director of AA&P.

6

Chief of AA/EEO.  Fuentes and four others were eventually interviewed for that position.  The Committee, meeting in an executive session, agreed that several of the other interviewees were better qualified than Fuentes for that position.  Acting on the Committee's behalf, Perskie met with Fuentes to inform him that he would probably not be hired to fill it.[0]  Approximately one month later, on January 2, 1991, the Committee reached its decision to hire Gustave Thomas for that position by a vote of four to one.[0]  Fuentes, who is Latino (Puerto Rican), brought the proceedings which led to this action.[0]

The district court concluded that Fuentes had made out a prima facie case of employment discrimination under the McDonnell Douglas/Burdine/Hicks line of cases, see McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973); Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089 (1981); St. Mary's Honor Ctr. v. Hicks, 113 S. Ct. 2742 (1993), a conclusion which the defendants have never challenged. The court concluded, however, that the plaintiff had not adduced sufficient evidence to enable a rational jury to conclude that defendants' numerous proffered reasons for failing to hire Fuentes were pretextual and that the real reason was discrimina-tory, and hence it granted summary judgment for the Commission.

---

[0]Two other directors, who were similarly approached, tendered their resignations.  Neither was a member of plaintiff's protected class.

[0]The Commission voted on all the proposed personnel actions as a package.

[0]Fuentes is also an African-American, but he does not claim racial discrimination, perhaps because Thomas -- the person who was hired for the job he sought -- is also an African-American.

7

It is from this judgment that Fuentes appeals.  We exercise plenary review.

## II.  LEGAL ANALYSIS

In a case of failure to hire or promote under Title VII, the plaintiff first

> must carry the initial burden under the statute of establishing a prima facie case of [unlawful] discrimination. This may be done by showing (i) that he belongs to a [protected category]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824.  If the plaintiff succeeds, the burden of production shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection."  Id.

The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.  See Hicks, 113 S. Ct. at 2748. The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimina-tion always rests with the plaintiff.  See Burdine, 450 U.S. at 253, 254, 256, 101 S. Ct. at 1093, 1094, 1095.  Once the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of

8

production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion).

At trial, the plaintiff must convince the factfinder "both that the reason was false, and that discrimination was the real reason." Hicks, 113 S. Ct. at 2752; see id. at 2754 ("It is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination." (emphasis in original)). The factfinder's rejection of the employer's proffered, legitimate reason permits, but does not compel, a verdict for the plaintiff. See Hicks, 113 S. Ct. at 2749. The test is whether the plaintiff ultimately persuades the factfinder that the employment decision was caused by bias, and for that purpose both the plaintiff's prima facie case and the factfinder's rejection of the employer's proffered evidence are circumstantial evidence of unlawful discrimination. See Hicks, 113 S. Ct. at 2749.

To prevail at trial, the plaintiff must prove not that the illegitimate factor was the sole reason for the decision, but that the illegitimate factor was a determinative factor in the adverse employment decision, that is, that but for the protected characteristic, the plaintiff would have been hired (or promoted). See Hazen Paper Co. v. Biggins, 113 S. Ct. 1701 (1993) (holding under the Age Discrimination in Employment Act ("ADEA") that "a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in [the

9

decisionmaking] process and had a determinative influence on the outcome").[0]

This basic framework under Title VII illustrates that, to defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. See, e.g., Hicks, 113 S. Ct. at 2479; Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 523 (3d Cir. 1992) (quoting Burdine, 450 U.S. at 256, 101 S. Ct. at 1095), cert. denied, 114 S. Ct. 88 (1993).

Because the factfinder may infer from the combination of the plaintiff's prima facie case and its own rejection of the employer's proffered non-discriminatory reasons that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reasons, see Hicks, 113 S. Ct. at 2749, a plaintiff who has made out a prima facie case may defeat a motion for summary judgment by either (i) discrediting the proffered reasons, either circum-stantially or directly, or (ii) adducing evidence, whether

---

[0]Hazen is an ADEA case but, where appropriate, the analysis used in describing the evidentiary burdens in an ADEA case are also used in a Title VII case. See e.g., Duffy v. Wheeling Pittsburgh Steel Corp., 738 F.2d 1393, 1396 (3d Cir.), cert. denied, 469 U.S. 1087 (1984).

10

circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action.  Thus, if the plaintiff has pointed to some evidence discrediting the defendant's proffered reasons, to survive summary judgment the plaintiff need not also come forward with additional evidence of discrimination beyond his or her prima facie case.  See Anderson v. Baxter Healthcare Corp., 13 F.3d 1120, 1122-24 (7th Cir. 1994).

We have stated that a plaintiff may avoid summary judgment by pointing to "some" evidence from which a factfinder could reasonably conclude that the defendant's proffered reasons were fabricated (pretext).  Next, we consider what quantum of evidence is required. We can reject out of hand the two extreme positions:  that the plaintiff can avoid summary judgment simply by arguing that the jury need not believe the defendant's proffered legitimate explanations on the one hand, or that the plaintiff must adduce evidence directly contradicting the defendant's proffered legitimate explanations on the other.  The correct solution lies somewhere in between:  to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder to reasonably infer that each of the employer's proffered non-discriminatory reasons, see Logue v. International Rehab. Assocs., Inc., 837 F.2d 150, 155 (3d Cir. 1988) (holding that "the district court erred in failing to consider all of [the employer's] proffered evidence of legitimate business reasons for [the plaintiff's] termination" (emphasis supplied)), aff'd after

11

remand, 866 F.2d 1411 (3d Cir. 1989), was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext). See Anderson, 13 F.3d at 1124; Bodenheimer v. PPG Indus., Inc., 5 F.3d 955, 958 (5th Cir. 1993).[0]

To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. See Ezold, 983 F.2d at 531, 533; Villanueva v. Wellesley College, 930 F.2d 124, 131 (1st Cir.), cert. denied, 112 S. Ct. 181 (1991). Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence," Ezold, 983 F.2d at 531, and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."[0] Josey v. John R. Hollingsworth Corp.,

_____

[0] We do not hold that, to avoid summary judgment, the plaintiff must cast doubt on each proffered reason in a vacuum. If the defendant proffers a bagful of legitimate reasons, and the plaintiff manages to cast substantial doubt on a fair number of them, the plaintiff may not need to discredit the remainder. That is because the factfinder's rejection of some of the defendant's proffered reasons may impede the employer's credibility seriously enough so that a factfinder may rationally disbelieve the remaining proffered reasons, even if no evidence undermining those remaining rationales in particular is available.
[0] Of course, a decision foolish, imprudent, or incompetent by comparison to the employer's usual mode of operation can render it implausible, inconsistent, contradictory, or weak.

12

996 F.2d 632, 638 (3d Cir. 1993) (internal quotation omitted); see id. at 638 (holding that the proper inquiry is whether the plaintiff has proffered sufficient evidence of "inconsistencies and implausibilities in the employer's proffered reasons"); Ezold, 983 F.2d at 527 ("[A] plaintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision." (internal quotations omitted)). While this standard places a difficult burden on the plaintiff, "[i]t arises from an inherent tension between the goal of all discrimination law and our society's commitment to free decisionmaking by the private sector in economic affairs." Ezold, 983 F.2d at 531.

III. APPLICATION TO THIS CASE

As just developed, to survive summary judgment, Fuentes had either (i) to present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon, the Commission's proffered reasons for not hiring him (e.g., by painting them as weak, implausible, contradictory, or incoherent), or (ii) to come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision (e.g., by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of

13

persons).  Fuentes has failed to raise a material issue of fact on either ground.

The Commission has advanced a multitude of reasons for not hiring Fuentes.  Notably, none of the reasons was that Fuentes was unqualified for the job; in the end, the Commission elected to hire Thomas instead of Fuentes because it felt that Thomas was better qualified.  In considering Fuentes for the newly created position of Chief of AA/EEO, the Commission faulted Fuentes for (i) lacking leadership qualities (Fuentes, in response to a request by Perskie for proposals for reorganization by each division head, had issued a brief and insubstantial recommendation; he failed to arrange to meet with Perskie about that memorandum although it was clear Perskie wished to discuss it;[0] in a report he included issues critical of a casino which he had not first discussed with the casino; and he failed to seek a meeting with Perskie after the press on two separate occasions reported that Perskie publicly criticized Fuentes' Division of AA&P); (ii) lacking management ability (Fuentes habitually arrived to work late, departed early, and took extended lunches; morale in AA&P was declining and the staff was unproductive; and despite repeated requests Fuentes declined to participate in committees including casino representatives to discuss major issues facing the casino industry, including labor and minority

---

[0]Although the parties dispute whether Perskie explicitly instructed the Directors to arrange a meeting with him or whether Perskie was to arrange the meetings, Fuentes' failure to contact Perskie for ten weeks is pertinent to his initiative and leadership (we note that every Director besides Fuentes arranged such a meeting).

14

business set-asides); (iii) lacking developed interpersonal skills (Fuentes had a poor working relationship with some of the Commissioners; and he lacked a good rapport with casino industry affirmative action officers because they felt he considered himself too important to meet with them); and (iv) unprofessional conduct (Fuentes was observed inside a car in a casino parking lot engaging in sexual activities; he got into a brawl at a casino, then misrepresented himself to be a police officer and used his influence as a Commission employee to receive special treatment; and on one occasion he shared confidential casino information with the public). The defendants contrast those incidents with Thomas' superior qualifications, corroborated by his remarkable accomplishments since being hired. Without going into each justification in detail, we simply note that Fuentes has not succeeded in throwing enough doubt on any of those explanations so that a rational factfinder could reject it.

Fuentes does make a timing argument, predicated on Josey, see id., 996 F.2d at 638-39 (illustrating that, "[o]n different occasions, this court has found that factors such as the defendant's credibility, the timing of an employee's dismissal, and the employer's treatment of the employee could raise an inference of pretext which would make summary judgment for the employer inappropriate"), namely, that things were going well for him until Perskie was appointed to head the Commission. But that is not the type of timing evidence Josey was referring to, namely, the timing of events which can give rise to an inference of improper motivation. The fact that a newly

15

appointed chairman, in a time of shrinking budgets state-wide and a governor's directive to eliminate staff positions, reorganizes a state agency and hires new managers for positions newly created by the reorganization who he believes will best perform the tasks at hand does not throw real doubt on the employer's proffered legitimate reason.

Additionally, Fuentes complains of the fact that the Commission documented its reasons for not hiring Fuentes after it had decided not to hire him (he refers to this as a calculated accumulation of all the negative facts and inferences from his past experience at the Commission) and argues that this post-decision undertaking leads to a strong inference of coverup (i.e., fabrication). As the district court pointed out, however, the Commissioners were not unrealistic to anticipate that Fuentes, no stranger to employment discrimination laws, would sue the Commission, and in this case the Commission's documentation can only be described as displaying business acumen. Given the frequency of employment discrimination suits, an employer which documents its reasons for taking adverse employment actions can often be more suitably described as sensible than as devious. Absent evidence providing an independent reason to suspect the act, the documentation of the reasons for rejecting an applicant is insufficient, in and of itself, to give rise to a reasonable inference of discriminatory motive.

Fuentes also attacks Papp's statement that he received complaints from five to ten members of the Division of Licensing critical of Fuentes because Papp did not remember their names

16

almost three years after the events in question transpired. Additionally, he discounts two of the four complaints Papp received from members of Fuentes' staff (Papp was able to name all four staff members raising the complaints) because two of those members were allegedly biased against him and hence not credible (we note that Fuentes has not contended that those staff members were biased against him because of his national origin). These criticisms amount to little more than the schoolground retort, "Not so," an approach which, as discussed supra at 11, does not create a material issue of fact. In the context at hand, the issue is not whether the staff members' criticisms of Fuentes were substantiated or valid, or whether Papp was remiss to rely upon feedback received from members of Fuentes' staff who might be (non-discriminatorily) biased against him. Instead, since Papp, not the staff members, was the relevant decisionmaker, the question is whether Papp believed those criticisms to be accurate and actually relied upon them, since only if Fuentes can prove that Papp in fact did not rely upon them can Fuentes show "pretext." We conclude that a factfinder could not reasonably find that Fuentes' cross-examination impeached Papp's statements to the point of rendering them weak, implausible, or incredible.

Instead of throwing doubt on defendants' explanations, Fuentes principally tries to go the alternate route by pointing to evidence from which a factfinder could reasonably conclude that discrimination was the more likely cause of his discharge. First, plaintiff argues that Chairman Read, his direct supervisor, thought that he was doing a fine job. Commissioner

17

Waters, who took a special interest in affirmative action, also approved of Fuentes' job performance.[0] But, as we stated in Ezold, the fact that the relevant decisionmakers disagree about the plaintiff's qualifications does not evidence discrimination. See id., 983 F.2d at 533. To avoid summary judgment, the plaintiff must point to some evidence from which a factfinder could reasonably conclude that the plaintiff satisfied the criterion that the decisionmakers disapproving of him relied upon (e.g., by showing that others no more qualified than he under that criterion were not treated adversely), or that the decisionmakers did not actually rely upon that criterion. As noted in the preceding paragraph, Fuentes' proffered evidence does not reasonably permit either conclusion.

Second, Fuentes argues that during his interview for the Chief of AA/EEO position, he was not questioned but was "interrogated" about Perskie's dissatisfaction with his job performance. As the district court noted, however, the facts that Fuentes had been working at the Commission for over three years, and that he was known to the interviewers (if not personally, then at least by reputation, opinion, and report), justified a departure from the normal interviewing process, and hence the "interrogation" does not raise an inference of invidious discrimination. It would defy common sense for an interviewer to put aside all his or her personal and/or acquired

---

[0] While he also cites his positive yearly Commission evaluations, Fuentes admits that he himself filled them out without any supervision or review.

18

knowledge of the interviewee and to proceed as if the interviewee were a stranger, and Title VII does not mandate so much. In any event, at his deposition Fuentes described the nature of the "interrogatories" directed at him as "[g]eneral questions about the industry," hardly an improper or suspicious subject given the position for which he was applying.

Third, Fuentes complains that, having corrected Commissioner Dodd's mispronunciation of his name some 20 months prior to the Commission's failure to hire Fuentes as Chief of AA/EEO (Fuentes testified that Dodd had asked to call Fuentes the English "Louis" instead of the Latino "Luis" because Dodd asserted he had "difficulty" pronouncing "Luis" and felt "more comfortable" with "Louis", and that he had responded that he would prefer Dodd call him by his Latino name), Dodd thereafter referred to him as "Director" instead of by his first name.[0] This evidence shows only that Dodd disliked Fuentes' first name because he had difficulty pronouncing it (not because it was a Latino name), and may reflect on Dodd's insensitivity and unprofessionalism. But we do not think that a jury could reasonably construe these incidents, standing alone (as they do), as evidencing Dodd's bias against Puerto Ricans or Latinos, or to mean that Dodd invidiously discriminated against Fuentes because of his national origin. Cf. Ezold, 983 F.2d at 545 ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to

---

[0]The defendants concede that Dodd referred to other Directors by their first names. The record does not give any indication how often Dodd and Fuentes had contact or, in particular, how often Dodd referred to Fuentes as "Director."

19

the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").

For the foregoing reasons, the district court's order granting summary judgment to the defendants will be affirmed.

20