

2009 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-24-2009

# William Snooks v. Duquesne Light Co

Precedential or Non-Precedential: Non-Precedential

Docket No. 08-1689

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2009

Recommended Citation

"William Snooks v. Duquesne Light Co" (2009). *2009 Decisions*. Paper 1826.
http://digitalcommons.law.villanova.edu/thirdcircuit_2009/1826

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2009 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 08-1689

———

WILLIAM SNOOKS,

Appellant,
v.

DUQUESNE LIGHT COMPANY,

Appellee.

———

On Appeal from the Order of the United States District Court
For the Western District of Pennsylvania
(No. 06-cv-01463)

———

Argued: February 2, 2009

Before: McKEE, STAPLETON, *Circuit Judges*, and IRENAS,[*] *Senior District Judge*.

(Filed February 24, 2009)

Samuel J. Cordes, Esq. (argued)
John E. Black, Esq.
Ogg, Cordes, Murphy & Ignelzi
245 Fort Pitt Boulevard
Pittsburgh, PA 15222

---

[*] Honorable Joseph E. Irenas, Senior United States District Judge for the District of New Jersey, sitting by designation.

Counsel for Appellant

Robert B. Cottington, Esq. (argued)
Cohen & Grigsby, P.C.
11 Stanwix Street, 15th Floor
Pittsburgh, PA 15222

Counsel for Appellee

———————

OPINION

———————

**IRENAS**, Senior United States District Judge.

This is an appeal from a grant of summary judgment in favor of Duquesne Light Company ("DLC"), the employer, in a Title VII race and gender discrimination case for failure to promote. 42 U.S.C. § 2000e-2. Lisa Stoehr, a Caucasian female, was promoted over William Snooks, an African-American male. The district court concluded that Snooks failed to raise an inference that DLC's proffered non-discriminatory reason for promoting Stoehr was pretextual and granted summary judgment in favor of DLC. For the reasons set forth below, we reverse.[1]

**I.**

Appellee Duquesne Light Company ("DLC"), the defendant below, is a supplier of

———————

[1] The district court had subject matter jurisdiction pursuant to 42 U.S.C. § 2000e-5 and 28 U.S.C. §§ 1331 and 1343(a)(4). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.

electric energy in southwestern Pennsylvania. Appellant William Snooks, the plaintiff below, is an African-American male, who was originally hired by DLC on November 8, 1976. Snooks is currently a Customer Activity Specialist B ("Specialist B") at DLC's Penn Hills location, and has held that position since 1997. (App. 33.) His responsibilities include turning on and off services and disconnecting or reconnecting electricity for non-payment. (App. 28.) During his employment with DLC, Snooks has held the positions of Mail/File Clerk, Apprentice Technician, Technician, Customer Order Representative, Credit and Collection Representative, and Collector. (App. 31-32, 34-37.) Snooks holds a bachelor's degree in psychology from the University of Pittsburgh. (App. 21.)

Lisa Stoehr is a Caucasian female, currently employed as the Field Activities Supervisor ("FA Supervisor") at DLC's McKeesport site. (App. 70, 94.) She has been employed at DLC since March 28, 1977. Prior to being promoted to FA Supervisor, she held the positions of Typist, Clerk in the accounting department, Customer Service Representative, and Specialist B. (App. 100.) She became a Specialist B in 1994. (App. 95-96.) Stoehr is a high school graduate and did not attend college. (App. 93.) She was also an officer on the executive board of the union that represents DLC's employees. (App. 163-64.)

On May 3, 2004, DLC posted a vacancy notice for the FA Supervisor position in its McKeesport office. (App. 313.) The notice listed the following qualifications: "Bachelor's degree in business or equivalent with five years experience in the Field Services area. Knowledge and understanding of the customer information and mobile

3

data systems."[1]  (App.  313.)  Applicants were given the option to either apply online at DLC's website, or submit a "Job Application Resume for Management Positions."[2] (App. 313.)

Seven employees applied for the position, and after a review of their applications, Keith McGill[3] selected five to be interviewed, including Snooks and Stoehr.  (App. 298-99.)  Of the five applicants selected for interviews, two were African-American males, two were Caucasian males, and one was a Caucasian female; the two applicants who were not interviewed were Caucasian males.  (App. 299.)  The five selected candidates were

---

[1] The parties dispute the meaning of the qualification.  Snooks contends that the "equivalent" term means that a candidate could have a bachelor's degree in business or a degree in another field with five years of experience in the Field Services area.  DLC contends, and the court below concluded, that five years experience is considered the equivalent to a bachelor's degree.  At the time of the posting, none of DLC's other FA Supervisors possessed college degrees.  (App. 298.)

[2] Snooks applied for the position by submitting a cover letter and resume.  (App. 315-16.)  Stoehr testified that she applied by completing the online form, and subsequently mailed her resume to Human Resources prior to being selected for an interview.  (App. 109-11, 339.)  Snooks's affidavit states that he was told by his current supervisor, Tausha Jackson, that Stoehr did not submit her resume until after litigation in this case had begun.  (App. 89.)  However, at her deposition, Jackson had no recollection of having any such conversation with Snooks.  (App. 311-12.)

[3] Keith McGill, a Caucasian male, was the Manager of Field Services and Energy Diversion at the time of the alleged discrimination.  (App. 238-40.)  He began in that position shortly after the posting for the McKeesport FA Supervisor vacancy.  His responsibilities included directly supervising the FA Supervisors at all four of DLC's locations.  (App. 298.)  As such, McGill was the person ultimately responsible for making the hiring decision for the McKeesport FA Supervisor position.  (App. 298.)

interviewed by McGill, James Cole,[4] and Lisa Minor[5] on August 5, 2004. (App. 299.) To ensure fairness, all the candidates were asked the same series of questions during the interviews. (App. 147, 197, 251, 317-24.) Following the conclusion of the interviews, McGill, Cole, and Minor discussed the performance of the candidates and concluded that Snooks and Stoehr had both performed well and were the best two candidates among the five interviewed. (App. 156, 259, 287-88.) They decided to hold a second round of interviews for Snooks and Stoehr as a "tie-breaker." (App. 156.)

Following that decision, Minor devised a matrix rating and assigning point values to the FA Supervisor candidates. (App. 157.) Minor did this entirely upon her own initiative, and was in no way required to do so. (App. 158.) The matrix assigned values in a number of categories that she felt should be considered, based on her impressions from the first interviews and information from their resumes. (App. 158-65, 341.) Snooks received an overall average score 4.6 out of 5 and Stoehr a 4.4 out of 5; the next closest candidate, Joe Stolarz received only a 3.6 out of 5.[6] (App. 341.) Minor also

_____

[4] James Cole, a Caucasian male, is DLC's Administrator of Field Services. (App. 187-88.)

[5] Lisa Minor, an African-American female, is a DLC Human Resource Specialist. (App. 135.)

[6] Snooks was awarded a 4 out of 5 for a bachelor's degree in "Business/Psychology," whereas Stoehr only received a 2 out of 5 for completing high school. However, Snooks does not have a business degree; he merely expressed interest in pursuing a degree in business during the interview. (App. 44.) Stoehr was awarded a 5 out of 5 in the category of "Leadership/Supervisor Skills," whereas Snooks was only awarded a 4 out of 5. Their scores in the remaining three categories were all 5 out of 5. (App. 341.)

prepared a "Top 3 candidate summary" summarizing her thoughts and recollections about each interview. (App. 165-67, 342.) The summary ranked Snooks first and Stoehr second. (App. 165-67.)

On August 10, Minor emailed the matrix and ratings to McGill and Cole. The email accompanying these two documents suggests that the candidate not promoted this time would be a good candidate for a future opening. It also indicated that Minor was going to be out the following week, but that McGill and Cole should proceed with the second round interviews as planned. (App. 340.) Accordingly, second round interviews were scheduled with both Snooks and Stoehr for August 19. (App. 55, 117, 263.)

Between the first and second interviews, McGill, as a new manager, wanted to spend a day in each of DLC's four Field Service locations to become more familiar with the day-to-day operations of the Field Services Department and the Specialist Bs. (App. 264, 299.) Therefore, McGill went on a "ride along" with a Specialist B from each of DLC's four locations. During their ride along, McGill would spend an eight-hour work day with a Specialist B and observe him or her performing their daily duties. (App. 265-66.) Al Duss, as the FA Supervisor for the Penn Hills location, selected Stoehr to take McGill for the ride along. (App. 226-27, 264.) The ride along took place on August 17, 2004. (App. 120.) According to both McGill and Stoehr, there was no discussion of the McKeesport FA Supervisor position, for which McGill would be conducting second

round interviews two days later. (App. 120-22, 266.)[7]

On August 19, 2004, both Snooks and Stoehr were interviewed a second time by McGill and Cole.[8] (App. 267.) The interview consisted of seven questions designed to elicit the candidates' reactions to real-life scenarios that a FA Supervisor might encounter. (App. 268, 327-330.) Both were asked the exact same questions. (App. 327-38.) McGill and Cole both took notes of the candidates' responses during the interviews. (App. 327-38.)

At the conclusion of the interviews, McGill prepared a summary of the interviews. (App. 299, 302.) It indicated that while Snooks "did a good job answering the questions . . . it was evident he did not have a detailed knowledge of the corporate policies." (App. 302.) Furthermore, McGill indicated he "had to ask leading questions in order to get [Snooks] to expound." (App. 302.) Despite these critiques, McGill noted that "We have additional positions that may come sooner than later due to retirements. Need to get [Snooks] some mentoring and he may make an excellent candidate." (App. 302.) On the other hand, the summary indicated that Stoehr "answered all questions in a thorough concrete manner. She had a knowledge of corporate policies and procedures. Very knowledgeable of disciplinary procedures." (App. 302.)

---

[7] By his own admission, Snooks has no knowledge of what took place during the ride along beyond Stoehr's later statement to him that she put McGill "through the ropes." (App. 83-84.)

[8] As she indicated in her August 10 email, Minor was on a planned vacation at the time. (App. 340.)

Both McGill and Cole testified they felt Stoehr had performed better in the second interview, and was therefore the better candidate.[9] (App. 223, 277.) As such, she was offered and accepted the position. (App. 119-20, 276.) Snooks was notified through intra-company mail that he did not get the position. (App. 58-59.) Following receipt of the notification, Snooks contacted Minor to express his disagreement with the decision. (App. 59-63.) In a subsequent phone conversation, Minor told Snooks that McGill had offered to mentor him so that he would be a stronger candidate for the Penn Hills FA Supervisor position that would become open when Duss retired.[10] (App. 63-66, 176-77, 300.)

Initially, Snooks agreed to meet with McGill, but later refused because he felt McGill's offer to mentor him was not genuine. (App. 65, 289-90.) Snooks claimed that he did not trust McGill because the mentoring offer was not contained in the letter informing him that he did not receive the promotion and he was not told about the offer until he had already complained to Minor. (App. 66-67.) However, McGill's summary from the interviews indicated that the mentoring was contemplated immediately after the

---

[9] McGill testified that Snooks's answers to questions 1, 2, and 5 demonstrated a lack of knowledge of corporate procedure. (App. 276.) Cole testified that he felt Stoehr answered five of the seven questions better than Snooks, whereas Snooks answered only question 5 better than Stoehr, and their answers to question 4 were comparable. (App. 215-22.)

[10] Both McGill and Snooks were aware that Duss was planning on retiring in the near future. (App. 66, 262, 300.) Duss's position was the potential opening to which both Minor's August 10 email and McGill's notes referred after the second round interviews. (App. 342, 329.)

interview. (App. 329.)[11, 12]

On September 9, 2004, Snooks filed a timely Charge of Discrimination with the EEOC claiming that DLC impermissibly discriminated against him in favor of Stoehr. In response, DLC filed a letter with the Pittsburgh Commission on Human Relations ("PCHR") outlining their position on November 15, 2004. The letter stated that "[Snooks]'s responses showed a lack of understanding of Company policies and a general reluctance to confront employees," citing his answers to questions 1 and 2 from the second interview as examples. It continued, "Stoehr's responses on the other hand showed a far better understanding of Company policies and willingness to invoke disciplinary procedures when appropriate." (App. 347.) The EEOC issued a Notice of Right to Sue on September 18, 2006. Snooks filed the Complaint in the instant case on November 3, 2006. DLC filed its motion for summary judgment on July 23, 2007, which was granted February 6, 2008. *Snooks v. Duquense Light Co.*, 2008 WL 351685, No. 06-01463 (W.D. Pa. Feb. 6, 2008).

---

[11] Snooks also applied for the Penn Hills FA Supervisor position when it became available upon Duss's retirement in mid-2005. (App. 85-86.) He was interviewed by McGill and a Human Resources representative and asked questions similar to those asked in his previous second interview. (App. 86.) However, Tausha Jackson, an African-American female with substantial supervisory experience, was selected for the position. (App. 300.) Snooks has not challenged Jackson's selection for that position.

[12] The record indicates that over the course of McGill's employment with DLC, he has been the decisionmaker for twenty hirings or promotions, fifteen of the successful candidates have been male, five have been African-American, and forty-five percent of the supervisors McGill has hired or promoted have been African-American. (App. 300.)

9

## II.

This Court exercises plenary review of the district court's decision granting summary judgment, and applies the same test that was applicable below. *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008). We review the record as a whole, drawing all reasonable inferences in favor of the non-moving party. *Hill v. City of Scranton*, 411 F.3d 118, 124 (3d. Cir. 2005). Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The burden of production then shifts to the employer to proffer a legitimate non-discriminatory reason for the adverse employment action. *Id.* The burden then shifts back to the plaintiff to prove that the proffered reason was pretextual. *Id.* In order to satisfy this burden and withstand the motion for summary judgment, the plaintiff must then present evidence that either "1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Id.* at 764. A plaintiff may satisfy this burden by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the emplyer did not act for the asserted non-discriminatory reasons." *Id.* at 765 (internal quotations omitted).

## III.

DLC's proffered non-discriminatory reason for hiring Stoehr is that she performed better in the second interview, with particular emphasis on her superior understanding of corporate policies, including the drug testing and discipline policies.[13] (App. 347.) The most persuasive of Snooks's challenges to DLC's conduct relate to McGill's ride along with Stoehr. Although Snooks has no personal knowledge of what McGill and Stoehr discussed during their eight hours together, the fact remains that Stoehr and McGill spent the day together just two days before the second round of interviews. A reasonable factfinder could infer that the two of them casually chatted over the course of the day, and that McGill could therefore have had a more favorable view of Stoehr simply from their otherwise benign conversation. We recognize that it was Duss, and not McGill, who chose Stoehr for the ride along. However, the mere fact that McGill went on the ride along, knowing full well that he would be interviewing Stoehr two days later, could certainly raise a question in the mind of the jury of exactly why Stoehr was selected for the promotion. *See Fuentes*, 32 F.3d at 765.

As further support for his argument that DLC's stated reason is pretextual, Snooks identifies a contradiction between the position statement DLC sent to the PCHR and the notes and testimony of McGill and Cole. In the position statement, DLC claimed that

---

[13] DLC conceded, for the purposes of summary judgment only, that a prima facie case could be established. Accordingly, we will only examine whether Snooks was able to satisfy his burden of demonstrating the reason was pretextual under *Fuentes*.

11

Snooks made no mention of the drug testing policy in response to a question about an employee who had been involved in a traffic accident. (App. 347.) However, the notes taken by both McGill and Cole indicate that drug testing was at least mentioned in Snooks's response to that question. (App. 327, 330.)[14] Similarly, Snooks argues that DLC gave Stoehr credit for an incorrect answer to a question regarding how to respond to employees using inappropriate language in the workplace, while his incomplete answer was not given credit. Snooks claims that DLC completely overlooked Stoehr's incorrect answer to this question.[15] Snooks argues that these apparent inconsistencies could support an inference that Stoehr had not actually demonstrated superior knowledge of DLC's disciplinary policy, and therefore the proffered non-discriminatory reason was pretext.[16]

---

[14] When shown the notes from his interview during his deposition, Snooks stated that they accurately reflected the content of his interview. (App. 57-58.) However, DLC points out that McGill's notes indicated that Snooks only mentioned the drug testing after being specifically asked about it. (App. 327.) During his deposition, Cole had no recollection of whether the drug testing policy was mentioned, and his notes are silent on whether it was mentioned with or without prompting by McGill. (App. 209, 330.)

[15] As part of her answer to a question regarding employees using inappropriate language in the workplace, Stoehr responded that she would tell them to "keep it down and take it outside." (App. 336.) Cole testified that "I don't think that was right." (App. 220.)

[16] DLC attempts to rebut this inference by highlighting that it is undisputed that Stoehr mentioned DLC's progressive discipline policy in response to question 1, thereby at least and demonstrating that she was aware of its existence. (App. 335.) McGill's notes also indicate that Stoehr did mention the possibility of disciplinary action in response to question 5. (App. 336.) Additionally, while Cole did testify that he felt Snooks answered question 5 better that Stoehr (App. 220.), he also testified that he felt Stoehr answered five of the seven questions better than Snooks. (App. 215-222.)

Snooks also raises a number of other issues that he asserts could also allow a reasonable factfinder to conclude that DLC's alleged reason was pretextual, including Snooks's alleged superior qualifications based on his reading of the job posting and Minor's matrix, whether Stoehr's resume was submitted prior to her interview, and holding a second interview in this instance when it was not the DLC's normal practice to hold more than one round of interviews. Although DLC provided seemingly benign explanations for all of the aforementioned issues individually, the district court was required to provide Snooks with all reasonable inferences based on the record as a whole. *See Hill*, 411 F.3d at 124.

Hence the district court erred by parsing each issue rather than reviewing the record in its entirety. The district court also recognized, but failed to properly apply the disjunctive nature of the *Fuentes* analysis. Snooks could have defeated the motion for summary judgment "by *either* (i) discrediting the proffered reasons, either circumstantially or directly, or (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes*, 32 F.3d at 764. It is unlikely Snooks provided sufficient evidence that DLC's decision was motivated by race or gender under the second prong of *Fuentes*. Nevertheless, he was still able to satisfy his burden under the first prong of *Fuentes*, by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [DLC]'s proffered legitimate reasons that a reasonable factfinder *could* rationally find them unworthy of credence." *Fuentes*,

13

32 F.3d at 765 (internal quotation omitted).  When examining all of Snooks's arguments together as a whole, particularly in light of the ride along, a reasonable factfinder could find that DLC did not make its decision based on Snooks's and Stoehr's comparative knowledge of corporate policy, and therefore "'that the employer did not act for [the asserted] non-discriminatory reasons.'"  *Fuentes*, 32 F.3d at 765 (quoting *Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993)).  Accordingly, Snooks has provided sufficient evidence for his claim to survive DLC's motion for summary judgment.

## IV.

For the foregoing reasons, we reverse the district court's grant of summary judgment and remand for further proceedings consistent with this opinion.