NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4403
_____

ARTHUR J. PETRIKONIS,
                                        Appellant

v.

WILKES-BARRE HOSPITAL COMPANY, LLC,
agent of Wyoming Valley Health Care System
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

(D.C. Civ. Action No. 3-11-cv-00280)
District Judge: Honorable Joel H. Slomsky
_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
September 12, 2014
_____

Before: McKEE, Chief Judge, SMITH, and SHWARTZ, Circuit Judges.

(Filed: September 12, 2014)

_____

OPINION
_____

SHWARTZ, Circuit Judge.

    Plaintiff Arthur Petrikonis appeals the District Court's grant of summary judgment

in favor of Defendant Wilkes-Barre Hospital Co., LLC ("the Hospital") in this

employment discrimination and breach of contract case. For the reasons that follow, we will affirm.

I

As we write principally for the benefit of the parties, we recite only the essential facts and procedural history. Petrikonis worked for the Hospital as a phlebotomist from 1995 to 1996. After a seven-year absence from the healthcare industry, he returned to work at the Hospital as a part-time phlebotomist and enrolled in courses at Luzerne County Community College ("LCCC") to obtain an Associate's Degree in nursing. To finance his education, Petrikonis received a $10,000 loan from the Hospital. As a condition of the loan, he was required to work full-time as a nurse for the Hospital for three years. The loan would thereafter be forgiven so long as he was not terminated for "just cause." App. 98.

Petrikonis graduated from LCCC in May 2009, and the Hospital granted his request to work on the orthopedic unit on floor 5E starting in July 2009. He was unable to commence work in July because he failed the nursing board exam. In October 2009, Petrikonis passed the nursing board exam, and Judy Ragukas, Clinical Director of 5E, reoffered him a position on 5E.

In November 2009, at age forty-eight, Petrikonis began an eight- to twelve-week orientation program on 5E.[1] He was initially paired with Pat Chivarella, an experienced

---

[1] When Petrikonis began orientation, seventeen registered nurses worked on 5E. Seven were over age fifty, and one was male.

nurse, who trained Petrikonis on the "basics of nursing" and noticed that he "made a lot of mistakes." App. 185, 192. On one occasion, Petrikonis attempted to use an IV that had fallen into a trash can. Moreover, despite instruction, he repeatedly failed to properly or efficiently bathe patients or to clean up afterwards. He was also unable to use the Pyxis, a machine that dispensed medications, without assistance, despite Chivarella's repeated instructions. Petrikonis could not recall basic information about his patients and needed daily instruction on what to record on patient charts. Chivarella reported to Mary Beth Moss, her supervisor, that Petrikonis was not progressing and that she was uncomfortable entrusting him with more difficult tasks.

After a few weeks, Petrikonis was assigned to a new nurse, Mary Carol Montagna. Montagna observed that Petrikonis was "struggling," App. 211, and "required constant direction and supervision," including step-by-step instruction for each task, from bathing patients and charting to timely distributing medications, App. 218. Like Chivarella, she too noted that Petrikonis was unable to learn "simple" tasks, such as how to retrieve medicines from the Pyxis, App. 214, needed a "very long time" and assistance to bathe a patient, App. 211-212, and "wasn't able to complete documentation," App. 222.

On December 8, 2009, Petrikonis underwent a "med pass." A med pass assesses whether a nurse is capable of passing medications. Moss conducted Petrikonis's med pass and noted that he "[n]eeded constant direction" and "was unable to proceed through one process of administering meds to a patient without checking each step with [her] first." App. 254. Moss said it took him an "unacceptable" length of time to remove

3

medications from the Pyxis and he required thirty-five minutes to complete an IV priming procedure that "should have taken 5 minutes." App. 254. Moss was unable to "establish any confidence that [Petrikonis] could pass meds on a patient assignment in a timely fashion without constant supervision." App. 254.

The next day, Petrikonis was given a second opportunity to complete the med pass. He again required "constant supervision or direction," needed assistance removing medications from the Pyxis, failed to record the result from a glucometer and then, when prompted to do so, indicated the incorrect number, could not identify a proper injection site, and required twenty minutes to complete an IV priming procedure. App. 255. In the end, Petrikonis was unable to complete the med pass "in a timely fashion" and another nurse had to administer approximately one-third of the medications. App. 255. Moss concluded that Petrikonis was "not building on any skill or procedure that was accomplished the previous day" and "show[ed] no initiative to complete a task on his own." App. 255.

Moss shared her observations with Ragukas, who prepared an Improvement Action Plan ("IAP") for Petrikonis. The IAP identified several of Petrikonis's deficiencies, including:

1. Inability to obtain medications from [P]yxis machine or obtain missing medication for his patients within a reasonable timeframe and without direction
2. Inability to identify proper injection sites
3. Inability to complete documentation of . . . assigned patients accurately, completely and within a reasonable timeframe
4. Inability to independently prime and administer iv medications

4

5. Inability to complete a reasonable assignment of 2 patients in a timely fashion [while] on week four of orientation
6. Has not yet taped report for the next shift
7. Was unable to obtain verification of accucheck result from the accucheck machine.

App. 258. The IAP included a plan to address each deficiency. Ragukas presented the IAP to Petrikonis on December 10 and informed him that she would reevaluate his performance on December 16 and that he would be terminated if his performance did not improve.

Petrikonis continued to make a number of mistakes, even after receiving the IAP. He failed to document patients' bowel movements, used incorrect markings on patient charts to indicate whether wounds were closed with sutures or staples, administered medications late by as much as three hours, incorrectly documented the time medications were actually administered, and "was still unable to complete an assignment without . . . direction and supervision." App. 221. After reviewing his records,[2] Ragukas decided on December 15[3] to terminate Petrikonis and informed him of her decision on December 16. As a result, Petrikonis did not complete his three-year employment commitment or repay the education loan.

Petrikonis filed a Complaint in the United States District Court for the Middle District of Pennsylvania, alleging that he was terminated based on his sex in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1), and the Pennsylvania Human Relations Act

---

[2] Ragukas did not compare Petrikonis's records to those of other nurses.
[3] Petrikonis did not work at the Hospital on December 12 or 13.

5

("PHRA"), 43 Pa. Stat. Ann. § 955(a), and his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 623(a)(1), and the PHRA, 43 Pa. Stat. Ann. § 955(a). The Hospital filed a counterclaim for breach of contract based on his failure to repay the education loan. After discovery was completed, the Hospital filed a motion for summary judgment on all claims, which the District Court granted. Petrikonis appeals.

II[4]

Because Petrikonis has not provided direct evidence of discrimination, we analyze his claims arising under Title VII, the ADEA, and the PHRA under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Burton v. Teleflex Inc., 707 F.3d 417, 425-26 (3d Cir. 2013) (applying McDonnell Douglas framework to Title VII and ADEA claims); Fairfield Twp. Volunteer Fire Co. No. 1 v. Commonwealth, 530 Pa. 441, 444 (Pa. 1992) (applying McDonnell Douglas framework to PHRA claim). The parties do not dispute that Petrikonis made out a prima facie case of age and sex discrimination and the Hospital offered a legitimate non-discriminatory justification for his termination as required under the first two steps of the McDonnell Douglas burden-shifting analysis. We therefore focus on whether Petrikonis produced "evidence from which a factfinder could reasonably infer that the employer's

---

[4] The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1343(a) and 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise plenary review over a district court's grant of summary judgment, applying the same standard that the district court should have applied. Klein v. Weidner, 729 F.3d 280, 283 (3d Cir. 2013). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

proffered justification," namely Petrikonis's deficient performance and lack of improvement, "is merely a pretext for discrimination."[5] Burton, 707 F.3d at 426. To make a showing of pretext, Petrikonis "must point to some evidence . . . from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). If he challenges the "credibility of the employer's proffered justification," then he must produce evidence "demonstrat[ing] such weaknesses, implausibilities, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." Burton, 707 F.3d at 427 (internal quotations marks and citations omitted).

Petrikonis does not contest that his performance was deficient in many respects.[6] He contends, however, that other nurses performed similarly but were not terminated. In

---

[5] Petrikonis claims that the Hospital's reason for terminating him shifted from charting errors to non-charting errors after he produced a report by Susan Heiser, who concluded that Petrikonis's "documentation[] was equal to the standards set by the other . . . [n]urses" on 5E. App. 332. This contention, however, is unsupported. The record shows Petrikonis was deficient in areas unrelated to charting as demonstrated in the IAP and his inability to complete a med pass. All of this evidence predates Heiser's report and therefore undermines Petrikonis's contention that the Hospital changed its proffered reason for terminating him to hide a discriminatory motive. See Siegel v. Alpha Wire Corp., 894 F.2d 50, 55 (3d Cir. 1990) (shift in reason for termination is evidence of pretext where employer's proffered reasons for termination at time of termination and during litigation are inconsistent).

[6] Petrikonis admitted to a number of mistakes, including making errors on patient charts, failing to accurately complete them, failing to accurately assess patients' risk factors, and administering medications late.

particular, he points to the performance of a younger female trainee ("Trainee"). Trainee's deficiencies are detailed in a report prepared by Susan Heiser, an individual Petrikonis hired to review the records of other nurses on 5E. The report notes a number of instances in which Trainee failed to document stools, administered medications late, and failed to record whether she encouraged deep breathing or the use of an Incentive Spirometer on three occasions when a patient's oxygen levels fell to dangerously low levels. Unlike Petrikonis, Trainee was not placed on an IAP or terminated.

Comparators may be used to discredit an employer's proffered reason for a termination by showing "that the employer treated other, similarly situated persons not of his protected class more favorably." Fuentes, 32 F.3d at 765. Petrikonis, however, has failed to show Trainee is similarly situated. First, Ragukas testified that she did not review the records of other trainees when she decided to terminate Petrikonis and there is no evidence that she was aware of the deficiencies in Trainee's performance. Thus, Petrikonis has not provided evidence from which the factfinder could conclude that Ragukas knowingly treated him and Trainee differently. See Morrow v. Wal-Mart Stores, Inc., 152 F.3d 559, 563 (7th Cir. 1998) (explaining that the "relevant inquiry . . . is whether [the employer's] management knew enough about [the comparator's] behavior to trigger an investigation"). Second, Trainee's and Petrikonis's deficiencies are not of "comparable seriousness." Lee v. Kan. City So. Ry. Co., 574 F.3d 253, 261 (5th Cir. 2009) (internal quotation marks omitted). The undisputed facts show that Petrikonis was unable to perform "simple" tasks expected of nursing school graduates, such as bathing

patients, and there is no evidence that Trainee shared these deficiencies. App. 214. Furthermore, Petrikonis failed to improve despite receiving repeated instructions, and there is no evidence that Trainee failed to improve after being instructed to correct her deficiencies. Therefore, Trainee is not similarly situated to Petrikonis, and thus her more favorable treatment does not show pretext.[7]

The timing of Petrikonis's termination also does not show pretext. Petrikonis was terminated after only five weeks of orientation and provided only a few days to address the concerns identified in his IAP. The evidence, however, demonstrates that Petrikonis's mistakes regarding "basic" nursing duties continued during the IAP period. While the Hospital certainly could have given Petrikonis additional time to demonstrate improvement, the "question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination." Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998). Given that Petrikonis's deficiencies concerned "basic" nursing duties and he showed no improvement, we cannot infer pretext from the timing of the Hospital's decision to terminate him.[8]

---

[7] Petrikonis also contends that he need not rely exclusively on Trainee because Heiser's report concluded that Petrikonis's charting errors were akin to those regularly committed by nurses on 5E. This argument focuses only on charting errors, however, and therefore fails to account for the many other deficiencies in Petrikonis's performance.

[8] Petrikonis also contends that the District Court erred in failing to consider a training manual that contained ethnic and racial stereotypes pertaining to patients. Specifically, he argues that this demonstrates an "institutional bias" that encouraged Ragukas to base her termination decision on discriminatory factors. As there is no evidence that Ragukas created the training manual, reviewed it in making the decision to terminate Petrikonis, subscribed to the views contained within it, or was accused of

Finally, with regard to the Hospital's breach of contract claim, Petrikonis concedes that he must repay the education loan he received from the Hospital unless his termination was without "just cause." App. 43, 98. Petrikonis relies solely on his purported evidence of pretext to show that he was not terminated for "just cause." Because we have concluded that the record does not contain evidence that the Hospital's performance-based reasons for termination were pretextual, there is no genuine issue of material fact regarding whether the Hospital had just cause and summary judgment as to the breach of contract claim was appropriate.

III

For the foregoing reasons, we will affirm.

---

discriminating against Petrikonis on the basis of his race or national origin, the training manual is not relevant to Petrikonis's discrimination claims.