Erica P. SMITH, Plaintiff,

v.

WALGREEN CO., Defendant.

Civil Action No. 12–26–CJB.

United States District Court,
D. Delaware.

Aug. 1, 2013.

William D. Fletcher, Jr., Schmittinger & Rodriguez, P.A., Dover, DE, Noel E. Primos, Schmittinger & Rodriguez, P.A., Dover, DE, for Plaintiff.

Gregory Brian Williams, Carl Douglas Neff, Fox Rothschild LLP, Wilmington, DE, Kate S. Arduini, Pro Hac Vice, for Defendant.

## *MEMORANDUM ORDER*

CHRISTOPHER J. BURKE, United States Magistrate Judge.

Plaintiff Erica P. Smith ("Smith" or "Plaintiff") filed this action against defendant Walgreen Co. ("Walgreens" or "Defendant"), alleging employment discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") and 42 U.S.C. § 1981 ("Section 1981"). Presently pending before the Court is Defendant's Motion for Summary Judgment ("Motion"). (D.I. 38) For the reasons set forth below, the Court DENIES the Motion.

## I. BACKGROUND

### A. Factual Background

Plaintiff is a resident of the State of Delaware and former employee of Defendant. (D.I. 1 at ¶¶ 1, 10) Defendant is an Illinois corporation with a business location at 1001 Forrest Avenue, Dover, Delaware (the "Dover location"). *(Id.* at ¶¶ 2, 11)

Plaintiff was employed by Defendant from July 31, 2008 until her termination on May 31, 2011. (D.I. 38 at 1; D.I. 41 at 2;

D.I. 42 at P2) [1] Plaintiff began her employment with Defendant as a Pharmacy Technician at Defendant's La Plata, Maryland location. (D.I. 41 at 2; D.I. 42 at P2) In late 2008, after obtaining certification, Plaintiff was promoted to the position of Senior Certified Pharmacy Technician, and subsequently began working at Defendant's Dover location, where she worked until she was terminated. (D.I. 1 at ¶¶ 10–11; D.I. 41 at 2; D.I. 42 at P2) Plaintiff is African–American, and at all relevant times was the only African–American certified pharmacy technician at the Dover location. (D.I. 1 at ¶ 9; D.I. 41 at 2; D.I. 42 at P30) The store manager of the Dover location was Eric Brauch. (D.I. 1 at ¶ 14; D.I. 41 at 2)

According to Plaintiff, the pharmacy employees of the Dover location regularly joked around, and it was not uncommon for them to make playful physical contact with one another. (D.I. 41 at 2; D.I. 42 at P4–P5) On May 12, 2011, an incident occurred between Plaintiff and another Pharmacy Technician, Sharon Meer, who is Caucasian, that allegedly underlies Defendant's decision to terminate Plaintiff (the "May 12 incident"). (D.I. 42 at P56–P58) The parties dispute the nature of this incident. For her part, Plaintiff alleges that in the course of joking around with Meer, Plaintiff leaned towards Meer and, while making a growling "ahh" noise, put her mouth on Meer's shirtsleeve and pretended to bite her. (D.I. 41 at 2–3; D.I. 42 at P5–P6, P48) Plaintiff adamantly denies actually biting Meer. (D.I. 41 at 2–3; D.I. 42 at P3–P7, P10, P48) Plaintiff asserts that in response to Plaintiff's contact with Meer's shirtsleeve, Meer laughed and playfully pushed Plaintiff's shoulder while continuing to work—even making further eye contact with Plaintiff and laughing seconds after the incident. (D.I. 41 at 3; D.I. 42 at P6, P83) Surveillance video of the May 12 incident also depicts other employees working nearby to Plaintiff and Meer at the time; Plaintiff asserts that these employees can be seen smiling immediately after the incident. (D.I. 41 at 3; D.I. 42 at P6, P83) In his deposition testimony, Store Manager Brauch acknowledged that, after reviewing the video, he "notice[d] [employees] smiling on the video" after the incident. (D.I. 42 at P25) [2]

In contrast to Plaintiff's testimony, Defendant produced an unsworn statement from Meer regarding the incident. (D.I. 38, ex. B) In it, Meer asserts that Plaintiff "came around the left side, bent over and with [her] mouth bit [Meer] through [her] shirt sleeve on [her] left arm." (*Id.*) Meer's statement continues that in response, Meer laughed uneasily, and then went down an aisle to get a drug product while remarking that she hoped that Smith had received a tetanus shot because Meer could not get one. (*Id.*) [3]

1. Defendant filed the Motion and a Memorandum of Law in support of the Motion together as D.I. 38. Unless otherwise noted, page citations to D.I. 38 are to pages in Defendant's Memorandum of Law in support of the Motion.

2. Defendant's opening brief noted that the May 12 "incident was captured by Walgreens' security camera, and [that] the footage has been produced in discovery[.]" (D.I. 38 at 3) Plaintiff attached the videotape as an exhibit to her answering brief. (D.I. 42 at P83) The videotape footage is discussed more fully below.

3. Aside from this unsworn statement, Defendant presents no deposition testimony or other evidence relating to Meer's direct account of the May 12 incident. Plaintiff has questioned whether Meer's unsworn statement, which is not subscribed to under penalty of perjury pursuant to the requirements of 28 U.S.C. § 1746 ("Section 1746"), may be properly considered for purposes of summary judgment. (D.I. 52 (hereinafter "Tr.") at 54); *cf. Gonzalez v. Temple Univ.*, Civil Action No.

Among the other employees working in the pharmacy at the time of the incident was Norah Rennewanz, a Senior Pharmacy Technician, who is Caucasian. (D.I. 41 at 3; D.I. 42 at P4) In his deposition, Brauch testified that he agreed that, from the video footage, it did not appear that Rennewanz could have seen Plaintiff's mouth making contact with Meer based on her location at the time of the incident. (D.I. 42 at P28) Meer's unsworn statement, however, indicates that she and Rennewanz discussed the incident on May 12, and concluded "that it needed to be reported"; Meer states that she asked Rennewanz "to wait [until] tomorrow so [that Meer could] decide[ ] how [she] wanted to deal with this." (D.I. 38, ex. B)

Yet on either the same day, or the next day, May 13, 2011, Rennewanz reported the incident to Brauch, telling him that Plaintiff bit Meer. (D.I. 41 at 3; D.I. 42 at P21–P22, P44) Following that report, on May 13, Brauch approached Meer and discussed the incident with her; during that conversation, Meer reported that Smith had bitten her. (D.I. 38, ex. B; D.I. 42 at P19–P22)[4]

A few days later, on May 18, 2011, Brauch questioned Plaintiff about the contact, which he described as a bite. (D.I. 42 at P6, P19–P20) Brauch asserts that Plaintiff admitted to biting Meer while joking around with her; Plaintiff disputes this and claims that she strongly denied to Brauch that she bit Meer. (*Id.* at P6, P20) Brauch told Plaintiff that he would question Meer about the incident, and would likely follow up with Plaintiff thereafter. (*Id.* at P6–P7)

Following this conversation with Brauch, Plaintiff apologized to Meer, to the extent Plaintiff had offended Meer or made her uncomfortable. (D.I. 38, ex. B; D.I. 42 at P10–P11) Plaintiff claims that Meer replied that it was "no problem[,]" stated that "people are nosy," and stated that she (Meer) had not affirmatively reported the incident to Brauch. (D.I. 42 at P10–P11) According to Meer's statement, Plaintiff went on to joke with Meer about feeling hungry, and told Meer "not to worry because [Meer] tasted like chicken," (D.I. 38, ex. B), which Plaintiff denies (D.I. 42 at P8, P48). Later that day, Brauch notified Plaintiff that Meer was offended by the May 12 incident, and that Plaintiff was suspended. (*Id.* at P7)

Defendant thereafter launched an investigation regarding the May 12 incident. (D.I. 38 at 4) On May 27, 2011, Marvin

---

11–7758, 2013 WL 1482623, at *1 n. 2 (E.D.Pa. Apr. 11, 2013) (finding that, pursuant to Rule 56(c), court could not consider unsworn declaration at summary judgment stage, where statement was not affirmed to be true under the provisions of Section 1746 or under penalty of perjury); *Deuber v. Asbestos Corp., Ltd.*, Civil Action No. 2:10–CV–78931–ER, 2012 WL 7761244, at *1 (E.D.Pa. Oct. 15, 2012) ("[A] declaration that is not sworn to under penalty of perjury or accompanied by an affidavit is not proper support in disputing a fact in connection with a motion for summary judgment."). The Court need not resolve the issue here, as even considering Meer's statement, its decision on the Motion would be unchanged.

**4.** In its reply brief, Defendant asserted that "Meer states in her signed written statement that she approached Eric Brauch to report the incident, and only then discovered that the incident had already been reported." (D.I. 45 at 5) However, Meer's statement does not specifically indicate whether Meer approached Brauch, or Brauch approached Meer. (*See* D.I. 38, ex. B) At oral argument, Defendant's counsel confirmed that the record suggests that it was Brauch who first approached Meer, not the other way around. (Tr. at 21 ("Mr. Brauch came and talked to [Meer]"); *see also* D.I. 42 at P22 (Brauch testifying at his deposition that, after Rennewanz reported the incident, he "knew [that he] needed to talk to [Meer] about the incident"))

Boyer, Defendant's loss prevention manager, interviewed Plaintiff about the incident. (D.I. 41 at 4; D.I. 42 at P8, P58) Boyer's role in such investigations is "simply fact finding"—he does not make recommendations regarding discipline, and did not do so in regard to Smith. (D.I. 42 at P46) During her conversation with Boyer, Plaintiff reported that the pharmacy employees would regularly engage in horseplay. (D.I. 41 at 4; D.I. 42 at P9) Plaintiff also advised Boyer that, about two months prior, Rennewanz had made racially derogatory remarks to Plaintiff on several occasions, comments that Plaintiff had not previously reported to her supervisors. (D.I. 38 at 4; D.I. 41 at 4; D.I. 42 at P9–P10, P51, P58) Plaintiff told Boyer that the remarks had offended her, but that she had only recently thought to report them. (D.I. 42 at P51) Specifically, Plaintiff said that on one occasion after Plaintiff had mentioned that she wanted some chicken, Rennewanz replied, "Oh, that's typical black people. All they want is fried chicken and watermelon." (D.I. 41 at 4; D.I. 42 at P9, P40–41) Additionally, Plaintiff reported that Rennewanz called Plaintiff "Aunt Jemima" on multiple occasions. (D.I. 41 at 4; D.I. 42 at P9, P40–41, P51) Boyer told Plaintiff that he would look into the matter. (D.I. 42 at P10)

On May 31, 2011, Plaintiff was terminated, purportedly for violating Defendant's Policy Against Workplace Violence. (D.I. 41 at 5; D.I. 42 at P58) That policy states that prohibited violence "may be in the form of . . . physical conduct" and defines inappropriate behavior as, *inter alia,* "[t]hreatening, intimidating, coercing, or harassing conduct of a verbal, nonverbal, or physical nature." (D.I. 42 at P55) Brauch testified that following the investigation into the May 12 incident, someone from employee relations recommended that Plaintiff's employment be terminated. *(Id.* at P16) The final decision to terminate

Plaintiff, however, rested "solely" with Brauch. *(Id.)* He explained that he based this decision on his belief that "biting is a violent act," and the incident was a "severe enough" violation of the Policy to warrant termination. (D.I. 41 at 5; D.I. 42 at P23–P25) Despite Plaintiff's explanation to him that the incident was "in fun," Brauch did not "deem it to be horseplay." (D.I. 42 at P25, P27–28) Of the approximately thirty Walgreens employees that Brauch terminated, Plaintiff was the only one terminated for violating Defendant's Policy Against Workplace Violence. *(Id.* at P13–14) Defendant eventually filled Plaintiff's position by hiring Keely Weber, who is Caucasian. (D.I. 41 at 6; D.I. 42 at P17–18)

On June 3, 2011, Boyer also interviewed Rennewanz, who admitted to making racially charged comments to Plaintiff but claimed that she had been "just kidding around with" Plaintiff. (D.I. 42 at P51; *accord* D.I. 38 at 4; D.I. 42 at P40–P41, P52) Rennewanz's written statement noted that it was not uncommon for her and Plaintiff to joke around with each other, and sometimes their jokes involved race. (D.I. 42 at P52) At some point thereafter, in early June, Brauch issued Rennewanz a written warning for violation of Defendant's Policy Against Harassment and Discrimination. *(Id.* at P27, P49–P51) The Policy Against Harassment and Discrimination defines inappropriate harassing behavior as, *inter alia,* "discriminatory comments, epithets, slurs, insults . . . or jokes about personal or physical traits or of a personal or physical nature." *(Id.* at P53)

Brauch testified that Walgreens has a zero tolerance policy against racial discrimination, *(id.* at P26–P27), and its Policy Against Workplace Violence specifically states that "there is a zero tolerance policy with respect to workplace violence[,]" *(id.* at P55). However, neither Defendant's Policy Against Harassment and Discrimi-

nation nor its Policy Against Workplace Violence automatically require termination with every violation. *(Id.* at P45, P53, P55) Rather, the polices both state that violators may be "subject to serious disciplinary action up to and including termination of employment." *(Id.* at P53, P55)

Defendant has put forward evidence that in the past five years, "six Delaware Walgreens employees, not including Smith, were terminated for violations of the Company's Policy Against Workplace Violence." (D.I. 38 at 4; *see also* D.I. 45 at 2 ("All of the other six individuals who were terminated worked in Delaware, as did Smith.")) Three of those employees were Caucasian, one was Hispanic, and two were African–American. (D.I. 38 at 4) Additionally, one African–American who was the subject of a complaint under the Policy remains employed by Defendant. *(Id.)*

While Defendant's brief did not attach as exhibits the relevant incident reports regarding these seven employees, Plaintiff's brief did so. (D.I. 42 at P59–P82) According to those reports, it appears that three of the employees were actually employed at locations in Maryland, not Delaware. *(See id.* at P59, P73, P79; Tr. at 26)[5] None of the incidents occurred in the Dover location, *(see id.* at P59–82), and thus Brauch did not play a role in any of these seven disciplinary actions (D.I. 41 at 6–7; D.I. 45 at 2).

### B. Procedural History

On January 12, 2012, Plaintiff filed her Complaint. (D.I. 1) On March 21, 2012, the parties jointly consented to the Court's authority to conduct all proceedings in this case, including trial, the entry of final judgment, and all post-trial proceedings.

(D.I. 11) A three-day jury trial is scheduled to begin on September 3, 2013. (D.I. 51)

On March 4, 2013, Defendant filed the instant Motion. (D.I. 38) Defendant's Motion was fully briefed as of May 2, 2013, (D.I. 45), and on June 11, 2013, the Court heard oral argument regarding the Motion.

### II. STANDARD OF REVIEW

A grant of summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585 n. 10, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). If the moving party has demonstrated the absence of a genuine dispute of material fact, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587, 106 S.Ct. 1348 (internal quotation marks omitted). If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

---

**5.** At oral argument, Defendant's counsel indicated his belief that these seven employees worked in the same district, which included locations in Delaware and Maryland. (Tr. at 26)

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348; *see also Podobnik v. United States Postal Serv.*, 409 F.3d 584, 594 (3d Cir.2005) (party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks and citation omitted). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (internal citations omitted). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III. DISCUSSION

### A. *McDonnell Douglas* Burden-shifting Analysis

Title VII provides, in pertinent part, that it shall be unlawful for an employer to "discharge any individual ... because of such individual's race[.]" 42 U.S.C. § 2000e–2(a)(1). Section 1981 provides that "[a]ll persons ... shall have the same right ... to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of the laws and proceedings ... as is enjoyed by white citizens." 42 U.S.C. § 1981. Because Plaintiff's Title VII and Section 1981 claims are governed by identical standards, the Court will consider these claims together. *See Jackson v. Temple Univ. Hosp., Inc.*, 501 Fed.Appx. 120, 123 n. 2 (3d Cir.2012); *Anderson v. Wachovia Mortg. Corp.*, 609 F.Supp.2d 360, 367 (D.Del.2009).

In the absence of direct evidence of discrimination, a plaintiff may prove race discrimination through the familiar burden-shifting analysis developed by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Hooten v. Greggo and Ferrara Co.*, Civ. No. 10–776–RGA, 2012 WL 4718648, at *3 (D.Del. Oct. 3, 2012). Under *McDonnell Douglas*, a plaintiff must first establish a *prima facie* case of race discrimination by a preponderance of the evidence. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Mercado v. Donahoe*, 487 Fed.Appx. 15, 17 (3d Cir.2012). If the plaintiff successfully establishes her *prima facie* case, the burden shifts to the defendant employer to proffer a legitimate, nondiscriminatory reason for the adverse employment action. *Reeves*, 530 U.S. at 142, 120 S.Ct. 2097; *Hooten*, 2012 WL 4718648, at *3. If defendant employer can provide

such a reason, the burden shifts back to plaintiff to demonstrate, by a preponderance of the evidence, that the reasons offered by defendant were not its true reasons for the adverse employment action, but were instead a pretext for discrimination. *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 410 (3d Cir.1999); *Luta v. Delaware,* 847 F.Supp.2d 683, 687 (D.Del.2012); *Hooten,* 2012 WL 4718648, at *3.

## B. Analysis

### 1. Plaintiff's *Prima Facie* Case

■■■ To establish a *prima facie* case, a plaintiff must show that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action; and (4) the adverse action occurred under circumstances that support an inference of unlawful discrimination. *Mercado,* 487 Fed. Appx. at 17; *Hooten,* 2012 WL 4718648, at *3.

In its briefing, Defendant conceded that the first three elements of Plaintiff's *prima facie* case have been established (in that Plaintiff is African–American, was qualified for her position, and was terminated), but contested that Plaintiff had sufficiently established the fourth element. (D.I. 38 at 6; D.I. 45 at 1) However, at oral argument Defendant's counsel conceded that Plaintiff had, in fact, made a sufficient showing as to the fourth element. (Tr. at 8) Indeed, Plaintiff has done so, in that she has demonstrated that she was replaced by someone outside of her protected class (by Keely Weber, a Caucasian)—a showing that, under the law, is sufficient to demonstrate that the adverse action occurred under circumstances that support an inference of unlawful discrimination. *See, e.g., Johnson v. Keebler–Sunshine Biscuits, Inc.,* 214 Fed.Appx. 239, 242 (3d Cir.2007); *Maynard v. Goodwill Indus. of Delaware,* 678 F.Supp.2d 243,

253 n. 13 (D.Del.2010). Thus, the Court finds that Plaintiff has established a *prima facie* case of racial discrimination.

### 2. Defendant's Legitimate, Non–Discriminatory Reason for Termination of Plaintiff's Employment

■ Under *McDonnell Douglas,* the burden next shifts to Defendant. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. This "relatively light burden" is satisfied "by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Fuentes v. Perskie,* 32 F.3d 759, 763 (3d Cir.1994); *see also Luta,* 847 F.Supp.2d at 687. "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Fuentes,* 32 F.3d at 763.

Here, Defendant contends that it terminated Plaintiff's employment not because of her race, but because it believed that she bit Meer, and that this was a serious violation of Defendant's Policy Against Workplace Violence. (D.I. 38 at 8) Plaintiff does not dispute that Defendant has proffered a legitimate, non-discriminatory reason for her termination. *(See* D.I. 41 at 11 (noting that "Defendant has articulated its alleged legitimate, non-discriminatory reason for Plaintiff's termination" and thereafter proceeding to the pretext inquiry); Tr. at 37) The United States Court of Appeals for the Third Circuit has held that dismissal for violating an employer's policy prohibiting workplace violence is "clearly a legitimate, nondiscriminatory reason for terminating an employee." *Money v. Provident Mut. Life Ins. Co.,* 189 Fed. Appx. 114, 116 (3d Cir.2006) ("Committing violence in the workplace is clearly a legitimate, nondiscriminatory reason for termi-

nating an employee."). Accordingly, Defendant has satisfied its burden here.

### 3. Pretext

Once an employer has articulated a legitimate, non-discriminatory reason for the plaintiff's termination, the plaintiff then carries the burden of proving that this reason was a pretext for discrimination. *Burdine*, 450 U.S. at 255–56, 101 S.Ct. 1089; *Johnson*, 214 Fed.Appx. at 242–43. In order to show pretext, Plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. In this Circuit, this two-pronged test is known as the *Fuentes* test. *Luta*, 847 F.Supp.2d at 688.

To support her claim that Defendant's proffered reason for Plaintiff's termination was pretextual, Plaintiff points to evidence that appears directed at both prongs of the *Fuentes* test. (D.I. 41 at 12–15; Tr. at 41–42, 46) The Court will examine Plaintiff's arguments in turn.

### a. Prong One

■ Under prong one of the *Fuentes* test:

> [T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.... Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the

employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence ... and hence infer that the employer did not act for the asserted non-discriminatory reasons.

*Fuentes*, 32 F.3d at 765 (internal quotation marks, brackets and citations omitted); *see also Luta*, 847 F.Supp.2d at 688. In other words, "a plaintiff may satisfy this standard by demonstrating, through admissible evidence, that the employer's articulated reason was not merely wrong, but that it was 'so plainly wrong that it cannot have been the employer's real reason.'" *Jones*, 198 F.3d at 413 (quoting *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1109 (3d Cir.1997)); *see also Luta*, 847 F.Supp.2d at 688. Cases analyzed under this prong survive summary judgment "when the employer's stated reason for termination is so implausible that a reasonable fact-finder could not believe it." *Connolly v. Pepsi Bottling Grp., LLC*, Civ. No. 06–1462, 2008 WL 4412090, at *9 (W.D.Pa. Sept. 22, 2008).

Plaintiff asserts that the evidence that Brauch reviewed regarding the May 12 incident—including video footage of the May 12 incident—stands in stark contrast to Brauch's testimony that Plaintiff's conduct constituted a "violent act" that amounted to a "severe enough" violation of Defendant's Policy Against Workplace Violence. (D.I. 41 at 12–15; D.I. 42 at P24–P25) Arguing that this evidence demonstrates that the incident was "inconsequential," Plaintiff contends that Brauch's conclusion to the contrary is thus full of the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" necessary to satisfy *Fuentes'* first prong.[6] (D.I. 41 at 12–15)

---

**6.** Defendant, for its part, suggests that the pretext inquiry should be short-circuited before it begins. To that end, it argues that

because Plaintiff has admitted to "making a growling noise and placing her mouth on her coworker's person" and "does not deny

The Court has reviewed the videotape of the May 12 incident, a video that Brauch also reviewed before making his termination decision. (D.I. 42 at P25) The video reflects a brief encounter between Plaintiff and Meer, where Plaintiff puts her mouth on Meer's upper arm, and Meer has a visible physical reaction to Plaintiff's conduct. *(Id.* at P83) It is a disputed fact as to whether Plaintiff actually bit Meer, or whether she pretended to do so, and the video does not make this clear one way or the other. Plaintiff asserts that, in the video, Meer can be seen smiling and/or laughing immediately after their encounter, and that, after Meer then "playfully push[es] Plaintiff on her shoulder," Meer can be seen laughing or smiling again a few seconds later when making eye contact with Plaintiff. (D.I. 41 at 1, 3) Although Defendant disputes that Meer is laughing or smiling in these images, (Tr. at 12–13), the Court must draw all reasonable inferences in favor of the Plaintiff here, and a factfinder could reasonably conclude that

the video shows what Plaintiff says it shows.[7] And there is no dispute that in the video, immediately after the incident occurs, at least one or more of Plaintiff and Meer's co-workers in the vicinity can be seen smiling or laughing (as can Plaintiff); none of those other co-workers appear to clearly react in a viscerally negative way after the incident. (D.I. 41 at 3; D.I. 42 at P25, P83; Tr. at 12) Thus, drawing all reasonable inferences in Plaintiff's favor, the videotape could be viewed as depicting a brief, playful interaction between Plaintiff and Meer of the kind Plaintiff suggests.

Plaintiff sets out additional evidence that she contends further highlights the "inconsequential" nature of the May 12 incident. Plaintiff notes, *inter alia,* that Brauch approached her about the incident approximately a week after it occurred, despite learning about it by no later than May 13. (D.I. 41 at 13) She cites the fact that it was Rennewanz, not Meer, who first brought the incident to the Brauch's attention, and

that Walgreens' Policy Against Workplace Violence provides that individuals who violate the policy are subject to termination" this "ends the pretext inquiry, as [Plaintiff] cannot dispute that she growled and made intentional physical contact with another employee, and that such conduct is a terminable offense." (D.I. 38 at 9) For support, Defendant cites to *Shontz v. Rite Aid of Pa., Inc.,* 619 F.Supp.2d 197, 209 (W.D.Pa. 2008) for the proposition that "where there is no dispute that plaintiff committed [a] terminable offense, there [is] insufficient evidence to demonstrate requisite weaknesses, implausibilities, etc. for the factfinder to conclude employer's reason was unworthy of credence." (D.I. 38 at 9–10) The Court is unpersuaded by this argument because, as Plaintiff points out, (D.I. 41 at 12), in *Shontz,* the plaintiff *admitted* that he had violated company policy. *Shontz,* 619 F.Supp.2d at 209; *see also Gupta v. Sears, Roebuck & Co.,* Civil Action No. 07–243, 2009 WL 890585, at \*17 n. 5 (W.D.Pa. Mar. 26, 2009) (plaintiff's admission of violation of company policy, which was proffered ba-

sis for her termination, supported a finding that plaintiff failed to offer sufficient evidence of pretext as to prong one of *Fuentes* test). Furthermore, in *Shontz,* the plaintiff failed to otherwise present sufficient evidence to establish pretext. *Id.* at 209. Here, in contrast, Plaintiff has repeatedly denied biting Meer, and has never conceded that the conduct she *has* admitted to (placing her mouth on Meer's shirtsleeve, growling, and "pretend[ing]" to bite Meer in a joking manner) amounts to a violation of Defendant's Policy Against Workplace Violence. (D.I. 42 at P5–P6, P10, P48, P58) Further, as noted below, Plaintiff has put forward other evidence in support of her claim of pretext regarding this prong. Therefore, the Court does not agree that the circumstances here are sufficiently similar to those in *Shontz,* or that the nature of Plaintiff s admissions ends the pretext inquiry.

7. In her own statement, Meer notes that she "laughed" after the incident, though noting that she did so "un eas[i]ly." (D.I. 38, ex. B)

that Meer never affirmatively sought out Brauch to discuss the issue. *(Id.* at 13–14) And Plaintiff claims that after she apologized to Meer for any offense taken, Meer replied that it was no problem, and had a nonchalant attitude about the incident, saying that "some people are nosy[.]" *(Id.* at 14; D.I. 42 at P10)

Moreover, in addition to considering this evidence about the relative severity of the incident, a factfinder could also consider the difference between the discipline imposed on Plaintiff and that imposed on Rennewanz. As is set out more fully below, the record evidence can support a conclusion that Plaintiff and Rennewanz were similarly situated, in terms of their respective violations of company policy— and Rennewanz was given only a written reprimand for her violation of the Policy Against Harassment and Discrimination. A factfinder could consider that disparity, in light of the other evidence above, and conclude that it further casts doubt on whether Plaintiff's violation of the Policy Against Workplace Violence was truly the reason for her termination.

The issue here is a close one, as to be sure, there is evidence of record that could well support a factfinder's conclusion that Defendant's asserted rationale for Plaintiff's firing is worthy of credence. Brauch testified that he interviewed Rennewanz and Meer after the incident, and both told him that Plaintiff had bitten Meer. It is certainly understandable why an employer would want to enforce its policies meant to prevent workplace violence. And while Brauch explained that the decision to fire Plaintiff was his alone, he noted that it was informed by a recommendation for termination made by an unspecified person in Defendant's employee relations department.

However, upon consideration of the evidence and the disputed facts of record, and giving the Plaintiff the benefit of all reasonable inferences, the Court finds that a reasonable jury could conclude that Defendant's proffered reason for termination is unworthy of credence and infer that Defendant did not act for the asserted nondiscriminatory reason. A jury could plausibly conclude that the contrast between the video footage produced by Plaintiff (and the other evidence of record put forward by Plaintiff about the aftermath of the incident) and Defendant's description of the incident as a "violent act" meriting termination, is significant enough to cast real doubt on the sincerity of Defendant's proffered explanation for the firing. Taking that evidence into account, as well as the disparate punishments Brauch imposed on Plaintiff and Rennewanz with regard to their respective violations of company policy in the same time period, the Court finds there is enough evidence to allow Plaintiff's claim to survive summary judgment as to *Fuentes'* first prong.

### b. Prong Two

Under prong two of the *Fuentes* test, a plaintiff must show that an employer's discriminatory reason was more likely than not a motivating cause of the employer's action. *Fuentes,* 32 F.3d at 764. To do so, a plaintiff may, for example, show that an employer has previously discriminated against her, that the employer has previously discriminated against other persons within the protected class, or that the employer has treated other similarly situated employees not within the protected class more favorably. *Fuentes,* 32 F.3d at 765; *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639, 645 (3d Cir.1998).

Plaintiff seeks to meet *Fuentes'* second prong by asserting that Defendant treated Rennewanz, who is Caucasian, more favor-

ably than Plaintiff.[8] (D.I. 41 at 1, 5, 10–11) "To make a comparison of plaintiff[']s treatment to that of an employee outside plaintiff's protected class for purposes of a Title VII claim, the plaintiff must show that [s]he and the employee are similarly situated in all relevant respects." *Carter v. Midway Slots & Simulcast,* 894 F.Supp.2d 529, 538–39 (D.Del.2012) (citing *Houston v. Easton Area Sch. Dist.,* 355 Fed.Appx. 651, 654 (3d Cir.2009)). "Whether a factor is relevant for purposes of a similarly situated analysis must be determined by the context of each case." *Id.* at 539 (citing *Houston,* 355 Fed.Appx. at 654).

Defendant responds that Rennewanz is not an appropriate comparator to Plaintiff because the two were not similarly situated. (D.I. 38 at 7) Defendant further contends that Smith cannot focus on one purported comparator (Rennewanz) while ignoring the six individuals from other Walgreens' locations that were terminated for violating the same policy as Plaintiff, because "[e]vidence of differential treatment of a single member of the non-

protected class is insufficient to give rise to an inference of discrimination." *(Id.)* (internal quotation marks and citation omitted) Defendant argues that these six employees of different races are the appropriate comparators here, and the fact that they were fired for violating the Policy Against Workplace Violence strongly counters Plaintiff's claim that her termination was the product of racial discrimination. *(Id.* at 7–8; D.I. 45 at 1) The Court will address these issues in turn.

### (1) Rennewanz

 Defendant argues that Rennewanz was not similarly situated to Plaintiff, because, *inter alia,* Rennewanz's conduct was not the same as Plaintiff's, and they violated different policies. *(See* D.I. 38 at 1–2, 7; D.I. 45 at 4) However, the similarly-situated inquiry is not so inflexible as to always require identical conduct among comparators. *Hooten,* 2012 WL 4718648, at *4 (noting that the plaintiff "is not required to show that he is identical to the similarly-situated comparator, but he

---

**8.** Plaintiff's answering brief appears to suggest that Meer and other pharmacy co-workers are comparators who were treated more favorably than Plaintiff, in pointing out that "no action was taken against Meer for pushing Plaintiff after allegedly being bitten," nor was any action taken against Plaintiff's co-workers who, according to Plaintiff, also regularly participated in verbal and physical horseplay. (D.I. 41 at 2, 10–11, 15) However, the Court finds that, as a matter of law, there is insufficient evidence for a jury to conclude that these individuals were similarly situated to Plaintiff. As to Meer, there is no evidence of record that this alleged push was ever formally reported to or investigated by Defendant. Moreover, according to Plaintiff, this alleged push came in the context of horseplay between the two. More broadly, Plaintiff provides almost no argument as to why, under the law, Meer should be considered a comparator, and so her allegations in this regard are not well developed. As to the other pharmacy employees, Plaintiff's allegations are also very

general, and she fails to cite to any evidence of record regarding other specific incidents of horseplay involving individuals outside her protected class. *See Wilcher v. Postmaster Gen.,* 441 Fed.Appx. 879, 882 (3d Cir.2011) ("[M]ere allegations are not sufficient to raise a genuine issue of material fact for the purposes of defeating summary judgment."); *Saellam v. Norfolk S. Corp.,* Civil Action No. 06–0123, 2008 WL 5286836, at *10 (W.D.Pa. Dec. 19, 2008) (finding that "Plaintiff's allegations regarding comparator employees are too general and lacking in context to support his discrimination claim"); *Stark v. Temple Univ.,* Civil Action No. 05–6718, 2007 WL 3047240, at *9 (E.D.Pa. Oct. 16, 2007) (insufficiently general evidence regarding whether individuals are proper comparators, such as no evidence regarding such individuals' duties or employment circumstances, could not withstand summary judgment). Thus, the Court cannot conclude, on the record before it, that any such individuals are proper comparators for purposes of this Motion.

must show 'substantial similarity' ") (quoting *Houston*, 355 Fed.Appx. at 655). Indeed, the United States Supreme Court in *McDonnell Douglas* established that pretext could be demonstrated by presenting evidence that comparators were involved in acts "of comparable seriousness" to the plaintiff, but were treated more favorably. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. 1817. The Third Circuit and this Court have similarly focused not on whether the purported comparators are identically situated, but on whether they "committed offenses of comparable seriousness." *Opsatnik v. Norfolk S. Corp.*, 335 Fed.Appx. 220, 223 (3d Cir.2009) (internal quotation marks and citations omitted); *Taylor v. Procter & Gamble Dover Wipes*, 184 F.Supp.2d 402, 410 (D.Del. 2002) ("When 'comparators' are used in a Title VII claim, the acts of non–minority employees must be of 'comparable seriousness' if the failure to discharge those employees is being proffered as proof of discriminatory intent.").

"Whether a comparator is truly similarly-situated to [a] plaintiff is an issue of law." *Moore v. Shinseki*, 487 Fed.Appx. 697, 698 (3d Cir.2012) (citing *Simpson*, 142 F.3d at 645–46). "[S]ummary judgment is appropriate where there is no evidence from which a jury could conclude the parties were similarly situated." *Fiala v. Bogdanovic*, Civil Action No. 1:07–cv–02041, 2009 WL 3260585, at *4 (M.D.Pa. Oct. 8, 2009); *see also McClain v. Pa., Dept. of Corrections*, Civil Action No. 09–1641, 2011 WL 2670204, at *9 (W.D.Pa. July 7, 2011) (denying motion for summary judgment where "[b]ased on the record evidence and viewing all evidence in the light most favorable to plaintiff ... a reasonable fact finder could conclude that [plaintiff] and [proposed comparator] were similarly situated.").

Here, for a number of reasons, the Court finds that a reasonable fact finder could conclude that Rennewanz and Plaintiff were similarly situated in all relevant respects.

First, the key players involved in Plaintiff's and Rennewanz's alleged violations are strikingly similar. Both Plaintiff and Rennewanz held the same position at Defendant's Dover location. Both were supervised by the same person: Store Manager Brauch. Both employees were alleged to have violated a Walgreens' company policy, and both sets of allegations were investigated by the same Walgreens' investigator. Perhaps most importantly, both employees were disciplined by the same person: their supervisor, Brauch.

Second, giving the Plaintiff the benefit of all reasonable inferences, Plaintiff's conduct, as described in her testimony and as reflected in the video surveillance, is at least of comparable seriousness to Rennewanz's racially-charged remarks to Plaintiff. Even Defendant acknowledges that, at least as a general matter, biting a fellow employee and making racially-charged remarks can amount to serious workplace misconduct. (Tr. at 22) Of course, both sets of conduct are different in *kind*—one involves the use of potentially harmful words, while the other involves potentially harmful physical contact. But even analyzing the specific nature of the conduct at issue in the two cases, there are plenty of similarities. Both Plaintiff and Rennewanz claim that they were just "joking around" or "kidding around" at the time of the respective incidents. (D.I. 42 at P3–P6, P48, P51–P52) Despite these characterizations, the alleged victims' responses are said to be similar: Meer claimed that she was "shocked" by Plaintiff's alleged bite, while Plaintiff reported being "offend-

ed" by Rennewanz's comments. *(Id.* at P51, P58)

Moreover, the policies that Rennewanz and Plaintiff were charged with violating, while not the same, are similar in many ways. *Cf. Melland v. Napolitano,* No. 10-cv–804–bbc, 2012 WL 1657067, at *13 (W.D.Wis. May 10, 2012) (granting summary judgment where plaintiff failed to present evidence that another employee in her position "who violated the same *or similar policies*" was not terminated) (emphasis added); *Spring v. Sealed Air Corp.,* Civil Action No. 10–4655, 2011 WL 4402600, at *9 (E.D.Pa. Sept. 22, 2011) (same). Both prohibit offensive or harassing workplace behavior, and the same conduct could well amount to a violation of both policies. (D.I. 42 at P53–P55) [9] Further, both policies subject violators to the same punishment: "serious disciplinary action [ ] up to and including termination of employment." (D.I. 42 at P53, P55) And Defendant described both policies as "zero-tolerance" policies, in that violations are met with some form of company-imposed discipline. (D.I. 42 at P26–P27, P53, P55); *see also Hill v. Se. Pa. Transp. Auth.,* Civil Action No. 09–5463, 2012 WL 646002, at *5 (E.D.Pa. Feb. 28, 2012) (denying motion to exclude evidence regarding proposed comparators, despite fact that comparators were charged with different workplace offenses than plaintiffs, as respective conduct at issue was not "so dissimilar" to warrant exclusion); *Cange v. Phila. Parking Auth.,* Civil Action No. 08–

3480, 2009 WL 3540784, at *9 (E.D.Pa. Oct. 30, 2009) (stating that even if Plaintiff was sleeping and a co-worker was loafing, this difference does not preclude the co-worker from being a valid comparator, in that both types of conduct violated defendant's Code of Conduct, and are "similar because both are punishable by termination").

Third, there were also similarities as to what occurred in the aftermath of the incidents. While Plaintiff did not immediately report Rennewanz's racially discriminatory comments, neither did Meer immediately report Plaintiff's conduct. And both incidents met with the same result after investigation: Walgreens found a violation of the respective policies in both cases.

Of course, as Defendant notes, (D.I. 45 at 4), there are some differences here too, as Plaintiff only reported Rennewanz's comments after Plaintiff's own conduct was being investigated, and then only after approximately two months had passed since the comments were made. But at least as to the timing of the *alleged victim's* reporting of the incidents, the difference could reasonably be viewed as not particularly meaningful. This is because in the case of the alleged biting incident, it was *Rennewanz,* not alleged victim Meer, who reported the incident to management; Meer never made an affirmative report, and it is not clear from the record that Meer ever would have reported the incident had Rennewanz not done so.[10]

9. *Cf. Epps v. First Energy Nuclear Operating Co.,* Civil Action No. 11–1462, 2013 WL 1216858, at *21 (W.D.Pa. Mar. 25, 2013) (noting that anti-harassment and workplace violence policies involved overlap as to some covered conduct, but declining to find certain coworkers of plaintiff to be proper comparators in part because the proposed comparators violated only one of the two company policies, while plaintiff engaged in distinct conduct that was found to violate both poli-

cies, such that employer used "different criteria" in disciplining the respective employees).

10. Again, according to Meer's statement, following the incident, she and Rennewanz discussed the prospect of such a report, but Meer asked Rennewanz to wait until the next day so that she could "decide[ ] how [she] wanted to deal with this." (D.I. 38, ex. B) In the interim, Rennewanz apparently proceeded to report the incident to Brauch. Plaintiff

Fourth, there is marked similarity in terms of the time frame in which both sets of alleged violations occurred, were investigated, and were resolved. The alleged biting incident took place on May 12, 2011, was reported to management by Rennewanz on May 13; Plaintiff was interviewed on May 27, and Brauch terminated Plaintiff's employment on May 31. (D.I. 42 at P43, P58) Similarly, Rennewanz's racially-charged comments were made to Plaintiff weeks before May 12, 2011, they were reported to management by Plaintiff on May 27; Rennewanz was interviewed on June 3, and Brauch issued her a warning days later. *(Id.* at P49–P52) Thus, not only was the timing of the key events here very close, but Brauch's disciplinary decisions with respect to Plaintiff and Rennewanz had to have been made simultaneously (or nearly so). *Cf. Epps v. First Energy Nuclear Operating Co.,* Civil Action No. 11–1462, 2013 WL 1216858, at *19 (W.D.Pa. Mar. 25, 2013) (rejecting former employee as a proposed comparator, *inter alia,* because the former employee's behavior occurred four and a half years before plaintiff's incident, and thus the incidents were "too remote in time ... to raise a reasonable inference of discrimination"); *Iuorno v. DuPont Pharms. Co.,* 129 Fed.Appx. 637, 641 n. 6 (2d Cir.2005) (declining to conclude that circumstances were sufficiently similar to permit a reasonable jury to draw an inference of pretext where, *inter alia,* plaintiff's identified comparator was terminated four years prior to plaintiff).

Accordingly, although physical contact and racially-discriminatory remarks are not identical forms of misconduct (and here were said to violate two different company policies), the circumstances involving Plaintiff and Rennewanz's conduct is sufficiently similar in so many other respects that Plaintiff may rely on Rennewanz as a proper comparator.[11] Because Rennewanz, a Caucasian employee, was

---

testified that Meer told Plaintiff that a "nosy" co-worker had reported the incident to Brauch and that Meer had a "nonchalant attitude" about it. (D.I. 42 at P10–P11) Drawing all reasonable inferences in Plaintiff's favor, it is certainly possible from these facts that Meer would not have reported the incident, or would not have done so until a later date.

11. To the extent that Defendant suggests that Plaintiff cannot meet her burden by putting forward evidence that a single comparator was treated more favorably, *(see* D.I. 38 at 7), the Court disagrees. Defendant cites to *Simpson v. Kay Jewelers, Div. of Sterling, Inc.,* 142 F.3d 639 (3d Cir.1998) for this proposition. In *Simpson,* an age discrimination case, the plaintiff put forward evidence that one similarly situated younger employee was treated differently, while ignoring a "sea" of other persons who were treated the same as plaintiff. *Id.* at 646–47. The *Simpson* Court found that plaintiff had not put forward sufficient evidence to establish an inference of discrimination because her "reliance on a single member of the non-protected class is insufficient to give rise to an inference of discrimination when [the plaintiff] was treated the same as thirty-four members of the non protected class." *Id.* at 646. The Court reads *Simpson* as standing for the proposition that a plaintiff in a discrimination case cannot cherry-pick a single comparator, while ignoring a host of other similarly-situated employees—not to mean that a plaintiff can *never* rely on a single comparator to make out her case. *See McClain,* 2011 WL 2670204, at *8 n. 7 (noting that *"Simpson* stands for the proposition that evidence of a single comparator cannot be viewed in a vacuum, especially where the record as a whole does not support a finding of discrimination" and finding that the facts of *Simpson* were distinguishable from those before it because plaintiff and plaintiff's comparator were the only two employees referenced in the record who had engaged in relevant conduct); *see also Davis v. Sch. Dist. of Pittsburgh,* Civil Action No. 10–61, 2012 WL 951857, at *10 (W.D.Pa. Mar. 20, 2012) ("Because the number of potential comparators is small, plaintiff's reliance on just one comparator is not flawed.").

given only a written reprimand for her violation of company policy, while Plaintiff was terminated for such a violation, Plaintiff has therefore proffered sufficient evidence to demonstrate that Defendant treated Rennewanz more favorably than Plaintiff.

### (2) Six Employees From Other Locations

■ Defendant also argues that Plaintiff cannot meet its burden under *Fuentes'* second prong because there are at least six other former Walgreens' employees, four outside of Plaintiff's protected class, who were in positions similar to Plaintiff and were treated identically. (D.I. 38 at 2, 7, 10) These individuals committed violations of Defendant's Policy Against Workplace Violence and were subsequently terminated, just as Plaintiff was. (*Id.*) However, the Court concludes that in light of certain differences between these six employees' circumstances and Plaintiff's circumstances, this evidence is insufficiently probative to warrant grant of the Motion.

As an initial matter, despite indications to the contrary in Defendant's briefs, three of the six former employees at issue worked at Walgreens' locations in Maryland, not Delaware. (*See* D.I. 42 at P59, P73, P79) More importantly, as Plaintiff points out, none of these incidents occurred at the Dover, Delaware location, and therefore none occurred under Store Manager Brauch's supervision; Brauch did not play a role in the termination of any of these six other individuals. (D.I. 41 at 6–7) Defendant downplays the significance of this fact, citing to *Klina v. Se. Pa. Transp. Auth.,* Civil Action No. 10–5106, 2011 WL 4572064, at *8 (E.D.Pa. Oct. 3, 2011), for the proposition that whether a plaintiff and a potential comparator shared the same supervisor is but one of many factors that may be considered in determining whether the employees are similarly situated. (D.I. 45 at 2)

However, in a case such as this, where the ultimate decision to terminate Plaintiff rested "solely" with Brauch, (D.I. 42 at P16), the identity of the decision-maker is particularly important. *See Johnson v. Koppers, Inc.,* No. 10 C 3404, 2012 WL 1906448, at *10 n. 6 (N.D.Ill. May 25, 2012) (finding that plaintiff was not similarly situated to another employee with a different supervisor, as "the requirement that employees share the same supervisor is important in cases where the adverse employment action is dependent on the judgment of one's supervisor"). Defendant is correct that the *Klina* Court, in setting out general legal standards in a race discrimination case, stated that appropriate comparators should share all relevant aspects of employment, and "might be [t]wo employees [who] dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct[,]" but that the sharing of the same supervisor was not an absolute prerequisite to establishing comparator status. *Klina,* 2011 WL 4572064, at *8 (internal quotation marks and citation omitted). However, just two short paragraphs later, the *Klina* Court, "persuaded by the cases cited above that it should be cautious in attempting to draw a comparison between Plaintiffs and employees from other departments who have not dealt with the same supervisor and are not tasked with the same duties or responsibilities[,]" declined to find that four employees with different supervisors were appropriate comparators to the plaintiff. *Id.* at *6, *8.

Beyond the result in *Klina,* the Third Circuit itself has repeatedly emphasized the importance of a plaintiff and comparator sharing the same supervisor in a case like this. *See Carey v. Fed. Express Corp.,* 519 Fed.Appx. 772, 776 (3d Cir.2013) (per

curiam) (holding that plaintiff "failed to show that [another] employee was [ ] similarly situated" where "the other employee did not work in the same regional office or for the same supervisors" as plaintiff); *see also Opsatnik,* 335 Fed.Appx. at 223 (noting that "there [is] no per se rule that comparator evidence from employees with different supervisors is irrelevant," but declining to find that employees with different supervisors were appropriate comparators because the plaintiff "failed to present evidence suggesting a link between the purported comparators and the motivations of the decision-makers who terminated" the plaintiff). This Court and other district courts within the Circuit have found the same. *See Taylor,* 184 F.Supp.2d at 410 (stating that "when employment decisions concerning different employees are made by different supervisors, such decisions are seldom sufficiently comparable ... because different supervisors may exercise their discretion differently"); *see also Solomon v. Phila. Newspapers, Inc.,* Civil Action No. 05–05326, 2008 WL 2221856, at *15 (E.D.Pa. May 21, 2008) (same); *Maull v. Div. of State Police,* 141 F.Supp.2d 463, 483 (D.Del.2001) (same).

Recognizing this case law, Defendant attempts to identify other commonalities among the disciplinary actions, arguing that (1) "[a]ll of the other six individuals who were terminated worked in Delaware, as did Smith" and (2) "Brauch testified ... that he terminated Smith's employment upon the recommendation of Employee Relations, following Marvin Boyer's investigation into Smith's conduct" and "Boyer also conducted the investigation of one of the six [other proposed comparators.]" (D.I. 45 at 2) Yet this effort does not demonstrate a strong link between the purported comparators and the motivations of the decision-maker who terminated Plaintiff. As noted above, all of the other six employees did *not* work in Delaware (indeed, half did not). Moreover, Boyer's efforts do not provide the requisite linkage, as Boyer testified that he played no role in the decision to terminate Smith, (D.I. 42 at P42, P46), and he obviously played no role in that process in the five other alleged comparator cases in which he was not involved.

Furthermore, the incidents in which these six employees were involved are notably different in kind than the May 12 incident. Specifically, the first potential comparator admitted to using profanity in making multiple threats of serious bodily harm to a co-worker. (D.I. 42 at P59–P61) The second potential comparator was alleged to have repeatedly used profanity while stating that she was going to punch another employee in the face, and later admitted to stating that she was going to punch her co-worker. (*Id.* at P62–P64) The third potential comparator admitted to having "snapped" during an argument with a co-worker and to then attacking the co-worker. (*Id.* at P65–P68) The fourth potential comparator admitted to attacking a co-worker. (*Id.* at P69–P72) The fifth potential comparator was alleged to have made a comment about cutting a co-worker's throat with a box cutter, and later admitted to making a comment about slitting someone's throat. (*Id.* at P73–P75) And the sixth potential comparator admitted to kicking a co-worker in the shin. (*Id.* at P79–P82) In these six cases, then, the employees admitted to making threats of serious bodily harm toward a co-worker, or to physically attacking a co-worker. The most Plaintiff has admitted to is putting her mouth on a co-worker and playfully pretending to bite her.

In light of these differences between the circumstances involving these six employees and Plaintiff, the outcome of these other employees' cases is not of sufficient

probative value to dilute the strength of Plaintiff s showing under prong two of the *Fuentes* test.

### (3) Conclusion

For the reasons set forth above—and in light of the other evidence supporting Plaintiff's claim set out in Section III. B.3.a—Plaintiff has adduced sufficient evidence to defeat summary judgment with regard to prong two of the *Fuentes* test.

## IV. CONCLUSION

In light of the Court's conclusions as to the above-referenced legal issues, it is hereby ORDERED that Defendant's Motion is DENIED.