NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-3132
_____

NANCY WEST,
                              Appellant

v.

NORTHAMPTON CLINIC COMPANY, LLC;
TANYA SEGAL

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 5-17-cv-02101)
District Judge: Honorable Jeffrey L. Schmehl

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
on April 18, 2019

Before: AMBRO, GREENAWAY, JR., and SCIRICA, *Circuit Judges*.

(Filed: August 14, 2019)


_____

OPINION[*]
_____

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

**SCIRICA**, *Circuit Judge*.

Plaintiff–Appellant Nancy West contends Defendant–Appellee Northampton Clinic Company (NCC) violated the Americans with Disabilities Act (ADA) when it terminated her employment. West says her post-traumatic stress disorder (PTSD) unlawfully motivated NCC's employment decision. But NCC offers a competing view: it terminated West because she violated hospital policy when she abandoned a patient during the final stage of open-heart surgery. West has not refuted this legitimate, nondiscriminatory justification. We will affirm the trial court's grant of summary judgment and entry of judgment.

## I.

West worked as a cardiothoracic physician assistant at NCC-owned Easton Hospital from 2007 until her termination in December 2014. Her job duties included direct patient care in connection with surgeries; she conducted pre-operative evaluations of patients, prepared them for surgery by harvesting veins and inserting catheters, performed surgical tasks assigned by the operating surgeon, and closed incisions. West's responsibilities required her to remain calm and focused throughout stressful situations.

West took leave under the Family Medical Leave Act, 29 U.S.C. §§ 2601–2654, beginning in May 2014. She had been the victim of a harrowing assault and experienced PTSD as a result. During West's leave, NCC hired Tanya Segal as Vice President of Human Resources. When it came time for West to return to work, Segal processed her return request. The two met, according to West, prior to her return; Segal did not

2

remember the meeting. West recalled Segal had asked her whether she was ready to return to work, demanded a letter from West's treating psychologist clearing her to return to work, and exhibited "a certain attitude of applying a stigma toward [her]." App. 345; *see also* App. 307. Segal initially rejected West's return-to-work note because it contemplated her need to attend "scheduled health care appointments." App. 232. West returned to her post in August 2014 and worked without incident for several months.

In November 2014, West was involved in an incident that resulted in her termination. West was assigned to assist Dr. Richard Angelico—a surgeon who, by West's account, had a history of belittling her and subjecting her to episodes of explosive anger—to perform a coronary-bypass operation on a high-risk patient. Also present in the operating room were Registered Nurses Cheryl Fleming and Lory Martini. After the nearly twelve-hour procedure Angelico left West, the only remaining professional qualified to directly care for the patient, to dress the incision. Martini had allegedly been bothering West throughout the procedure, criticizing her technique and refusing to help her. West eventually lost her patience and cursed at Martini, who responded by calling security. West then left the operating room, announcing, "I'm quitting today right now, bam, and I'm going to the bathroom." App. 328. Fleming and Martini recorded contemporaneous accounts noting West stormed out of the operating room before fixing the patient's severed pacing wire and securing his surgical dressing. Although West later claimed the patient was at this point stable and dressed—despite a malfunctioning suction and severed pacing wire—she conceded she returned to the operating room to "finish

3

up." App. 328. There she found Dr. Angelico and a medical resident attending to the patient.

Segal investigated this operating room incident at the prompting of the hospital's Chief Executive Officer and Chief Medical Officer. The executives told Segal they understood West had lost her temper in the operating room and had "refused to complete the surgical dressing and address the pacing wire that had been cut." App. 147. Segal spoke with the doctors and some of the nurses who participated in the procedure.[1] She reviewed statements written on the day of the incident by those present. This information generally confirmed that West became agitated and left the operating room before finishing up with the patient. Dr. Angelico, Segal learned, returned to the operating room to close the incision.

Segal also interviewed West. West maintains the interview centered on her use of profanity and denies that Segal brought up patient abandonment.[2] West explained to Segal that she "snapped," perhaps due to a "combination of fatigue . . . [and] posttraumatic stress." App. 335. West recounted her frustration with Martini, whose alleged recalcitrance compounded the difficulty of West's responsibilities. West remembered Segal asking her whether she had felt like she did when she was assaulted.

---

[1] Segal claims she met with Fleming, but Fleming denies participating in Segal's investigation.

[2] Segal recalled otherwise. Her notes from the meeting indicate she "told [West] that it was against Hospital policy to abandon a patient." App. 8. n.4 (internal quotation marks, citation, and emphasis omitted).

4

Segal, the Chief Medical Officer, and the Chief Executive Officer concluded the investigation demonstrated West abandoned a patient and agreed termination was the appropriate recourse. Segal advised West of the hospital's decision to terminate her employment on December 12, 2014.

After exhausting administrative remedies, West sued NCC, its parent company Community Health Systems,[3] and Segal. She claimed NCC violated the ADA, 42 U.S.C. §§ 12101–12213, and the Pennsylvania Human Relations Act (PHRA), 43 Pa. Cons. Stat. § 951–963, by discriminating and retaliating against her on the basis of her PTSD. West also alleged Segal violated the PHRA by aiding and abetting NCC's supposed discriminatory practices. *See id.* § 955(e). The trial court granted summary judgment to defendants on all claims.[4] This appeal follows.[5]

---

[3]  The parties stipulated to Community Health Systems' dismissal without prejudice.

[4]  West does not contest the trial court's determination that she conceded her ADA retaliation claim, and in neither her opening nor reply briefs does she even mention her PHRA claims. West has forfeited any challenges to the trial court's holdings related to these claims. *See Geness v. Cox*, 902 F.3d 344, 355 (3d Cir. 2018). Accordingly, we limit our review to West's ADA discrimination claim.

[5]  The trial court had jurisdiction under 28 U.S.C. § 1331. We have appellate jurisdiction under 28 U.S.C. § 1291. A trial court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). We construe all facts and inferences in the light most favorable to the nonmoving party and decline to "weigh the evidence or make credibility determinations." *Boyle v. Cty. of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (citation omitted). If the moving party demonstrates the absence of a genuine dispute of material fact, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted). It instead must provide specific facts demonstrating "a genuine issue for trial." *Id.* at 587 (internal quotation marks, citation, and emphasis omitted).

## II.

## A.

The ADA makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The *McDonnell Douglas* burden-shifting framework governs a claim of discriminatory discharge in violation of the ADA. *See Walton v. Mental Health Ass'n of Se. Pa.*, 168 F.3d 661, 667–68 (3d Cir. 1999) (discussing, among other authorities, *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). The plaintiff must first establish a prima facie case of disability discrimination, which involves showing: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (quoting *Gaul v. Lucent Techs.*, 134 F.3d 576, 580 (3d Cir. 1998)).

Once the plaintiff makes this prima facie showing, the burden of production shifts "to the employer to articulate some legitimate, nondiscriminatory reason for" its employment action. *McDonnell Douglas*, 411 U.S. at 802. This burden is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." *Id.* (citation omitted).

6

If the employer offers a sufficient justification, the burden returns to the plaintiff to prove by a preponderance of the evidence that the employer's justification is merely pretext for discrimination. *See id.* To do so in a manner sufficient to withstand a summary judgment motion, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* at 764.

**B.**

West's claim fails because she has not rebutted NCC's nondiscriminatory reason for terminating her. Even if we generously assume West has made a prima facie showing of disability discrimination, she still cannot prevail. As noted, NCC maintains it terminated West's employment because she violated hospital policy by abandoning a patient. West falls short of her "difficult burden" to establish an inference that NCC's rationale is pretextual. *Id.* at 765. She advances two arguments to contest NCC's position that it fired her for patient abandonment. Both fail.

First, West challenges NCC's understanding of the operating room incident, arguing she did not in fact abandon the patient. This argument misses the mark. NCC need not prove West's conduct objectively constituted patient abandonment. She must instead show NCC did not truly terminate her for abandoning a patient. *See Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 154 & n.9 (3d Cir. 2017). West cannot satisfy her burden because the record unmistakably supports a finding that NCC acted on its proffered reason. Segal's report mirrors the accounts of those present during the

7

operating room incident, and it follows up on conduct that jeopardized the hospital's responsibility to ensure patient safety. West's quibbles with the merit of NCC's assessment of the operating room incident are beside the point.[6] *See Fuentes*, 32 F.3d at 765 ("To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken . . . ."). She must show a rational factfinder might disbelieve the patient abandonment rationale and instead credit the employee's theory of discriminatory discharge. *See id.* But West can point to only weak and attenuated mention of her disability that—even on this standard of review—do not so much as hint that invidious discrimination motivated NCC.[7]

Second, West urges us to disregard NCC's patient abandonment rationale because it is irretrievably tainted by Segal's unreliability. This argument too fails. West emphasizes three inconsistencies. First, Segal claimed to have spoken with Fleming during her investigation when Fleming denied having such a conversation. Second, Segal

---

[6]    Her argument that Segal's report constitutes inadmissible hearsay the trial court should have disregarded fails for a similar reason. The report has not been offered for the truth of the matter asserted—*i.e.* West's conduct actually amounted to patient abandonment. Rather, the report serves the non-hearsay purpose of illuminating NCC's reasons for terminating West.

[7]    She argues, for example, Segal's skeptical treatment of her when she sought to return to work betrays NCC's true, discriminatory motives. In the retaliation context, we rejected a claim in part because a three-month gap separated "protected activity and the adverse action." *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007). This temporal delay defeated "an inference of causation." *Id.* West faces an even steeper challenge, as she hopes the August interactions can help sustain her position that NCC concocted a pretextual basis for her December firing. We find West's theory unconvincing. Her arguments based on Segal's investigation fare no better. To be sure, Segal alluded to West's PTSD when she interviewed West. But this isolated mention of West's disability—even if we take it as indicative of animus—pales in comparison to the evidence that shows NCC acted on its patient abandonment determination.

8

denied speaking with West in August before her return to work, contrary to West's recollection. Third, Segal admitted to have claimed falsely in an email to her superior that the hospital had "had issues with [West] in the past." App. 242. West insists these infirmities torpedo Segal's report and mandate reversal of the trial court's grant of summary judgment. We disagree.

These inconsistencies are unrelated to NCC's nondiscriminatory reason for firing West and do not create a genuine dispute of material fact. Put another way, even after resolving each in West's interest and drawing every plausible inference in her favor, there is still no evidence from which to raise a dispute of fact that patient abandonment "did not actually motivate the employment action." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d at 764). For example, whether or not Segal spoke with Fleming, West does not deny Segal reviewed Fleming's account of the operating room incident, which supports NCC's patient abandonment position. West has not contradicted "core facts," those that support the honesty or legitimacy of NCC's narrative. *Id.* (citations omitted). Her deposition testimony itself is generally consistent with the core facts on which NCC relies: West left a patient in the operating room before closing his incision and fixing a severed pacing wire. Her testimony is consistent with the surgeons' recollections they returned to the operating room to finish what she left incomplete. Jeopardizing patient safety and violating hospital policy are valid reasons for adverse employment action. Any blemishes in the investigation are insufficient to undermine as pretext NCC's patient abandonment rationale.

### III.

For the reasons provided, we will affirm the grant of summary judgment and entry of judgment.